Puerto Rico Ilustrado, Inc., demandante, apelada y apelante, *v.* Rafael Buscaglia, Tesorero de Puerto Rico, demandado, apelante y apelado.

Núm. 9042.—*Sometido:* Marzo 5, 1945. *Resuelto:* Mayo 4, 1945.

*Hon. Procurador General Interino Jesús A. González* y *G. Benítez Gautier, Procurador General Auxiliar,* abogados del apelante-apelado; *R. Cuevas Zequeira,* abogado de la apelada-apelante.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

En 1942 el Tesorero de Puerto Rico requirió de pago a Puerto Rico Ilustrado Inc.[1] por la suma de \$163,987.74, en concepto de arbitrios, penalidades e intereses sobre varios artículos traídos a Puerto Rico por el Ilustrado durante los últimos diecisiete años. El requerimiento del Tesorero amenazaba con proceder a tenor con la sección 105 de la Ley de Rentas Internas—que provee el embargo y venta pública de los bienes del contribuyente que deje de pagar las contribuciones impuestas por dicha ley—de no verificarse el pago dentro de diez días. Sin embargo, este término fué prorrogado varias veces en lo que las partes discutían el asunto. Luego, el Ilustrado pagó sin protesta varios miles de dóla-

[1] En lo sucesivo llamada el Ilustrado.

res y el Tesorero redujo sustancialmente la cantidad reclamada. Entonces el Ilustrado pagó bajo protesta las sumas de $68,221.94 y $43,664.95, iniciando estos dos pleitos para recobrar las mismas. Después de un juicio en los méritos, la corte de distrito dictó sentencias contra las cuales ambas partes han apelado en cuanto a ciertos extremos de las mismas.

## I

■ El Ilustrado se dedica casi exclusivamente[2] a la publicación, distribución y venta de dos diarios—El Mundo y The World Journal—y un semanario, Puerto Rico Ilustrado.[3] Con vista de estos hechos, alega la corporación que ninguno de los artículos traídos por ella a Puerto Rico está sujeto a los arbitrios impuestos por el Tesorero. El Ilustrado basa su contención en la sección 83 de la Ley de Rentas Internas. Dicha sección provee que el impuesto establecido por las secciones 62 y 16 a de dicha Ley no gravará "la venta de periódicos y sus anuncios y obras literarias, científicas, filosóficas y libros escolares de texto".[4]

Convenimos con la corte de distrito en que esta contención carece de méritos. La exención hallada en la sección 83 está limitada a la venta del producto terminado. Nada encontramos en ella que provea la exención de arbitrios en la materia prima utilizada en confeccionar las publicaciones o la maquinaria mecánica que éstas requieren. No estamos autorizados a conceder al Ilustrado una exención mayor que aquélla conferídale por la Legislatura, que supo cómo extender el alcance de tal exención cuando así quiso hacerlo (Véase la sección 83 eximiendo la "venta de abonos y fertilizantes,

---

[2] Ciertas transacciones esporádicas de alegadas ''ventas'' de materia prima a competidores son examinados en detalle más adelante, VII, *infra*.

[3] El Ilustrado también publica, presumiblemente mientras dure la guerra, dos periódicos de las fuerzas armadas, Yank y Caribbean Sentinel; pero en esto nada hay relevante a la controversia de este caso.

[4] Ley núm. 83, Leyes de Puerto Rico, 1931 (pág. 505); Ley núm. 4, Leyes de Puerto Rico, 1939, Sesión Extraordinaria, pág. 17.

así como las de toda materia prima que se utilice en la elaboración de los mismos'').

Las exenciones contributivas no pueden inferirse; deben consignarse específicamente en lenguaje claro e inequívoco. (*Monllor & Boscio, Sucrs.* v. *Sancho, Tes.*, 61 D.P.R. 67; 1 Mertens *Law of Federal Income Taxation*, Secciones 3.01, 3.07; *United States* v. *Stewart*, 311 U. S. 60, 71; *New Colonial Co.* v. *Helvering*, 292 U. S. 435). No encontramos en la sección 83 tal lenguaje específico. Ésta exime la venta del producto terminado—el periódico propiamente dicho—y nada más. Debe rechazarse la contención del Ilustrado.

## II

■ Pasamos por tanto a las contenciones de las partes en cuanto a cada uno de los artículos aquí envueltos. El Tesorero arguye que el Ilustrado tenía que pagar un arbitrio del 10 por ciento sobre la rotativa y sus accesorios traídos a Puerto Rico por el Ilustrado y usados por éste para publicar sus periódicos. El estatuto pertinente—inciso 27 de la sección 16 de la Ley de Rentas Internas, según quedó enmendada por la Ley núm. 83, Leyes de Puerto Rico, 1931— dice como sigue:

"*Abanicos y ventiladores eléctricos, neveras y estufas eléctricas o de gas flúido.*—Sobre todo abanico o ventilador eléctrico, neveras y estufas eléctricas o de gas flúido y aparatos automáticos movidos por gas flúido o electricidad, que se venda, traspase, fabrique, use o introduzca en Puerto Rico, un impuesto de diez (10) por ciento sobre el precio de venta." (5)

La primera cuestión a determinar es si la rotativa es automática. La corte de distrito sintetiza la evidencia sobre este punto como sigue: ''Según el testigo A. Ramos [quien

---

(5)La historia legislativa de este inciso, que empieza como el inciso 41 de la sección 16 de la Ley de Rentas Internas (Ley núm. 85 de 1925, pág. 585) y ahora es el inciso 20 de la misma (Ley núm. 25 de 1942, Tercera Sesión Extraordinaria, (2) pág. 127)), se investiga en detalle en III, *infra*. Aquí sólo se necesita indicar que el texto de 1931 predomina sustancialmente a los fines del presente caso.

declaró por el Ilustrado], la máquina, si bien funciona por electricidad, requiere la constante atención del obrero para ponerla a funcionar y pararla; se hace menester suplirle el papel y tinta, cuando el papel se acaba o la máquina lo rompe, es preciso parar la máquina para suplirle o en su caso cambiar el papel, así como cuando la tinta se acaba, se hace necesario pararla para suplirle tal substancia nuevamente; además hay que graduarla de vez en cuando. Según el Sr. Fragoso [quien declaró por el Tesorero], 'la rotativa coge el papel, hace el periódico, lo saca, lo dobla y en eso no hace falta la intervención humana, para que lo imprima, con solamente echarla a andar.' '' (Corchetes nuestros).

El resolver que esta evidencia justificaba la conclusión de que una rotativa no es automática, nos obligaría a concluir que la Legislatura quiso decir que no es automática cualquier cosa que necesite la intervención humana en su funcionamiento, no importa lo pequeña que ésta sea. Éste es casi—aunque quizás no completamente—un argumento de que la Legislatura quiso decir que ''automático'' equivale a ''movimiento perpetuo''. Creemos que la Legislatura tenía en mente un propósito enteramente diferente. En nuestra opinión, no le preocupaba las implicaciones científicas de la palabra ''automático''. Creemos que expresaba la noción del ciudadano promedio que, al observar el vasto cúmulo de artículos domésticos e industriales producto de la ciencia e industria modernas, piensa que ''automático'' es algo nuevo que ha desplazado un artículo que desempeñaba antes la misma función de manera menos mecánica.(6)

---

(6)Nuestro punto de vista está de acuerdo con la definición del Webster's *New International Dictionary,* Segunda Edición:

''Automático – 1. Que tiene un poder inherente de acción o movimiento. 2. Maq. Que tiene un mecanismo que actúa o se regula por sí mismo o que realiza una operación requerida en un punto predeterminado en su funcionamiento;— *dicha especie de maquinaria o artefactos que realizan el trabajo anterior o usualmente hecho a mano;* como, la válvula automática alimentadora de un torno. ...''

Resulta evidente que este significado corriente del término "automático" fué el que la Legislatura tuvo en mente, cuando examinamos la clase de artículos tributados específicamente por el inciso 27.([7]) Los abanicos, neveras y estufas requieren instalación, iniciación, ajuste, reparación e interrupción efectuados por la intervención humana. No podemos convenir con el juez de distrito quien, aparentemente dando por sentado que estos artefactos eran automáticos, pensó sin embargo que una rotativa al compararse con ellos no era automática. Creemos que si acaso, a la luz del complicado funcionamiento de una rotativa, ésta es más automática([8])—en el sentido práctico en que la Legislatura empleó el término—que los simples artículos domésticos específicamente señalados en el inciso 27. Ningún lego que observe tal rotativa imprimir miles de periódicos en pocos minutos pensaría en calificar su funcionamiento en otra forma que no fuera automático. Por tanto no vacilamos en resolver que una rotativa es automática dentro del significado de dicho término tal como éste se usa en el inciso 27.

"Máquina automática. Una máquina o su accesorio que, después de ponerse en movimiento opera automáticamente *excepción hecha de proveerse energía, lubricación, material o interrumpir la energía.*" (Bastardillas nuestras).

Según lo indica un caso citado por el propio Ilustrado, "automático" significa "sin la *continua* aplicación de la fuerza humana" *(State v. Louisville & N. R. Co.,* 96 N. E. 340, 344 (Ind., 1911); bastardillas nuestras); es decir, "automático" contempla la reducción sustancial—no necesariamente la eliminación total—de la intervención manual.

([7])Nos damos cuenta que, al recurrir a los otros artículos sobre los que el inciso 27 impone arbitrio como una ayuda para determinar el significado de "automático", estamos invocando el principio de *ejusdem generis.* Véase III, *infra.* Pero si la regla de *ejusdem generis* da color—y limita—el significado de "aparato", tiene necesariamente que hacer lo mismo al adjetivo "automático" que precede a la palabra "aparato". El Tesorero desearía que aplicáramos *ejusdem generis* solamente al adjetivo "automático"; el Ilustrado desearía que se la aplicáramos solamente a "aparatos movidos por electricidad". Aplicaremos la regla a toda la frase, no fragmentadamente para satisfacer la teoría de alguna de las partes. En cuanto al punto que ahora está ante nos, opera en contra del Ilustrado.

([8])La frase "más automática" quizás horrorice a los gramáticos; pero nuestro punto de vista en cuanto a la palabra "automático" según se usa en esta Ley nos exige que hablemos de los grados de dicha palabra.

## III

 Pasamos entonces al siguiente problema: ¿Opera el uso de la frase "aparatos automáticos movidos por gas flúido o electricidad" del inciso 27, en el sentido de hacer que una rotativa esté sujeta a un arbitrio de 10 por ciento a tenor con dicho inciso? Invocando la regla de *ejusdem generis* y la doctrina relacionada de *noscitur a sociis*, la corte de distrito resolvió que la Legislatura quiso emplear esa fraseología general con el único fin de incluir en dicho inciso todos los otros artículos que, aunque no expresamente designados en el inciso 27, pertenecían a la misma clase que aquéllos de hecho enumerados en detalle en dicho inciso; y que de la misma manera, la Legislatura no tuvo la intención de cubrir mediante dicha frase general artículos de una clase enteramente diferente y superior que aquéllos específicamente enumerados en el inciso.

Por tanto la corte de distrito llegó a la conclusión de que toda vez que una rotativa, que cuesta más de $100,000, obviamente no era de la misma clase de mercancía que un abanico eléctrico, ventilador, nevera o estufa, sino más bien de una clase diferente y superior, la Legislatura no tuvo la intención de imponerle a la misma un arbitrio de 10 por ciento a tenor con el inciso 27. El Tesorero se queja de esta actuación de la corte inferior. Afirma que la regla de *ejusdem generis* no se aplica a la frase general "aparatos automáticos" que se encuentra en el inciso 27, y que por tanto una rotativa está sujeta al arbitrio de 10 por ciento como tal "aparato".

No es difícil exponer la regla de interpretación estatutaria comprendida en la pequeña frase *ejusdem generis,* que significa literalmente "de la misma clase o especies".(⁹) En

---

(⁹)No estamos de acuerdo con la teoría de que la enunciación autorizada de esta máxima produce sin más la solución a los problemas complicados de interpretación estatutaria. Nos damos cuenta que " . . . la máxima ha desmerecido en predominancia e importancia, ahora que las realidades del derecho se han convertido en cuestiones muy complejas para forzarse dentro de una oración . . . ". (Cardozo, *Law and Literature,* 52 Harv. L. Rev. 471, 478).

2 Sutherland, *Statutory Construction,* 2a. ed., se expresa así (pág. 395):

"Cuando palabras generales siguen después de palabras específicas, en una enumeración descriptiva del sujeto legal, las palabras generales se interpretan en el sentido de sólo comprender objetos similares de la naturaleza de aquéllos enumerados por las palabras específicas precedentes." La regla (pág. 399) "cumple el propósito de dar efecto tanto a las palabras específicas como a las generales, tratando las palabras específicas como indicadoras de la clase, y las palabras generales como amplificadoras de las disposiciones del estatuto para cubrir todo lo que caiga en dicha clase, aun cuando no se mencione específicamente por las palabras específicas."

" * * * * * * *

"La doctrina se aplica cuando existen las siguientes condiciones: (1) el estatuto contiene una enumeración por palabras específicas; (2) los miembros de la enumeración constituyen una clase; (3) la enumeración no cubre toda la clase; (4) un término general sigue a la enumeración; y (5) no se manifiesta claramente la intención de que se le dé al término general un significado más amplio que el exigido por la doctrina." (pág. 400).

Aplicando estos requisitos al inciso 27, encontramos que (1) específicamente enumera los abanicos eléctricos, ventiladores, neveras, estufas; (2) estos artículos pertenecen a una clase—artículos domésticos; (3) en modo alguno la enume-

---

Pero la vitalidad de la regla de *ejusdem generis* no puede fácilmente echarse a un lado. Puede que sea "muy gastada" *(National Labor Relations Board,* v. *Newark Morning Ledger Co.,* 120 F. (2d) 262, 275 (C.C.A. 3d, 1941)); y "dependiendo como depende de pura forma", puede constituir "una medida peligrosa con la cual medir el alcance estatutario que la Legislatura tuvo en mente." (2 Sutherland, *Statutory Construction,* 3ª. ed., pág. 401). Sin embargo, tiene sus raíces tanto en la lógica como en el significado del lenguaje. Y más importante, está destilada de la experiencia; el inmenso número de casos que invocan *ejusdem generis (American and Federal Digests, Statutes,* llave 194; 2 Sutherland, supra, casos en los escolios, págs. 393-412) es testimonio elocuente que se aprueba constantemente legislación—que se lee por los interesados—teniendo en mente esta regla que se funda en razonamiento, gramática y lenguaje. Frecuentemente se ha aplicado a leyes contributivas. 1 Mertens, supra, sección 3.16. Véase generalmente, *Domínguez* v. *P. R. Ry., Light & Power Co.,* 19 D.P.R. 1090, 1094-5; *Flores Alvarez & Co.* v. *Gallardo,* 36 D.P.R. 117, 122; *Canet* v. *Corte,* 61 D.P.R. 150, 158.

ración cubre toda la clase—en seguida vienen a la mente otros artículos domésticos similares, tales como máquinas de lavar, de planchar, aspiradores, calentadores, batidoras, unidades de refrigeración y secadores de pelo;[10] (4) "aparatos automáticos movidos por electricidad"[11] es un término general que sigue a la enumeración detallada; y (5) nada hay en el estatuto que manifieste una intención de que al término general le sea dado un significado más amplio que el exigido por la doctrina.

Parece claro que es de aplicación por tanto, a los hechos aquí envueltos, la regla de *ejusdem generis*. Sin embargo creemos propio examinar en detalle ciertas contenciones que pudieran hacerse en contrario en relación con los cinco requisitos precedentes. En cuanto al primero y segundo, el argumento concebiblemente podría ser que la Legislatura no tuvo la intención de darle un significado limitado al término general aquí usado, porque "los miembros de la enumeración, si bien específicos, son esencialmente diversos en su carácter". (Sutherland, supra, pág. 404). Dicha teoría está predicada en una supuesta inhabilidad de encontrar un *idem genus* en el cual encajen todos los artículos a los cuales el inciso 27 les impone arbitrio. No estamos de acuerdo. Reconocemos que algunos de estos artículos podrían usarse en una oficina o edificio público más bien que en el hogar. Pero todos ellos son artefactos mecánicos operados por energía para la comodidad o gustos humanos. El *genus*, aunque am-

---

[10] El que algunos de estos artículos no hubieran sido puestos en el mercado en 1931, cuando la frase general aquí envuelta se aprobó por primera vez, no quiere decir que la frase no los cubra. Por el contrario, el propósito fundamental de la frase general, según lo contempla la regla de *ejusdem generis,* es que artículos específicos—bien inadvertidos o no fabricados pero de la misma naturaleza general que aquéllos expresamente enumerados—están incluídos dentro de la frase general y por tanto sujetos a contribución cuando los mismos lleguen al mercado.

[11] De cuando en vez emplearemos más adelante esta forma concisa de la frase general, para abreviar.

plio, existe; ([12]) y los artículos enumerados específicamente— y otros no enumerados allí—caen dentro de él. Esta excepción a la regla de *ejusdem generis* por tanto no es de aplicación a este caso. ([13])

El presente caso fácilmente cumple con el tercer requisito. ([14]) Las palabras específicas—abanicos eléctricos, ventiladores, neveras y estufas—no cubren todos los artículos "de la clase designados por la enumeración". Por el contrario, como hemos visto, un número de otros artículos similares caen dentro de la misma clase. Las palabras generales—aparatos automáticos movidos por gas flúido o elec-

---

([12]) Indudablemente "aparato," por sí sola, es una palabra de las más amplias connotaciones. Es tan general y comprensiva que, según la define Webster's *International Dictionary*, Segunda Edición, puede usarse en ciertos contextos para incluir "cualquier instrumento o artefacto complejo, mecánico o químico, para una acción u operación específica; *maquinaria;* mecanismo." (Bastardillas nuestras). Véase *Hinckley-Tandy Leather Co.* v. *Hazelwood*, 35 S.W. (2d) 209, 211 (Tex., 1931); 14 Words and Phrases, págs. 660-64. Pero aquí el punto es precisamente si se usó en su significado ilimitado, o más bien si tomó color de y fué restringido a la misma clase de artículos que la precedieron en la enumeración específica. Como palabra neutral de contenido indefinido, pudo haber sido usada en cualquier sentido. Es nuestro deber determinar qué significado fué el que la Legislatura tuvo en mente.

([13]) Notamos de paso que no están aquí envueltas otras excepciones a la regla—por ejemplo, cuando no se trata de hacer enumeración alguna, o cuando la enumeración es meramente demostrativa (2 Sutherland, supra, pág. 403; *Grosjean* v. *American Paint Works*, 160 So. 449 (La. App., 1935); véase *Tugwell* v. *Corte de Distrito*, 64 D.P.R. 220)—claramente no están envueltas aquí.

([14]) 2 Sutherland, supra, ofrece la razón para este requisito a las págs. 405-7: "Cuando las palabras específicas abarcan todas las personas u objetos de la clase designada por la enumeración, las palabras generales tienen un significado más allá de la clase. El aplicar la regla en este momento haría que las palabras generales no tuvieran significado con motivo de que nada hay *ejusdem generis* que caiga dentro de su esfera. En su consecuencia su aplicación contravendría la más importante regla de interpretación de que debe dársele efecto a todas las palabras. Con el fin de impedir su rechazo como excedente, las palabras generales asumen un significado ilimitado por el fundamento de que la Legislatura, mediante la adición de palabras generales a una enumeración detallada, tiene que haber tenido en mente que ellas conllevan un significado fuera de la clase". Lo vuelve a describir en lenguaje diferente a la pág. 403: " . . . cuando la especificación de estos objetos clasificados como inferiores es completa y se añaden palabras generales, entonces los objetos de naturaleza superior están comprendidos dentro del significado de las palabras generales con el fin de evitar su rechazo como excedente."

tricidad—tienen una función que desempeñar: el cubrir otros objetos de la misma clase no expresamente mencionados en el estatuto. Por tanto, no hay base para darles un significado distinto e ilimitado.

El cuarto requisito no necesita discusión. Aquí la frase es indudablemente una frase general que sigue a una enumeración específica.([15]) La única cuestión es si la frase tiene un significado amplio o limitado. Y eso depende primariamente de nuestra conclusión en cuanto a si se han cumplido los otros cuatro requisitos de *ejusdem generis*.

Nos damos entera cuenta que el quinto requisito es de suma importancia. Toda la ciencia sobre *ejusdem generis* carece de significación si el estatuto contiene la manifestación clara de una intención contraria. Como otras reglas de interpretación estatutaria *ejusdem generis* es sólo una ayuda.([16]) "Si, al considerar el contexto y los propósitos que se trató de realizar y de la ley en conjunto, surge adecuadamente que las palabras generales no se usaron en el sentido limitado sugerido por la regla, debemos dar efecto a la conclusión brindada por el punto de vista más amplio con el fin de que no fracase la voluntad de la Legislatura." (*Helvering* v. *Stockholms etc. Bank;* 293 U.S. 84, 88, 89, citado en 2 Sutherland, supra, pág. 409). Además, "la regla de *ejusdem generis* no se aplicará si resulta en una interpretación inconsistente con la historia legislativa del estatuto, con otras reglas de interpretación predominantes, o con los estatutos en *pari materia.*" (Sutherland, supra, págs. 410-12).

Pero aquí (*a*) el lenguaje de nuestra Ley, (*b*) la posición de las palabras generales en el estatuto, (*c*) el título, (*d*) la historia legislativa y (*e*) estatutos en *pari materia* no demuestran una intención contraria. Más bien todos ellos con-

([15])Véase infra, para una discusión del efecto de la transposición—por una enmienda de 1936 del inciso 27—de las palabras generales desde el final de la enumeración hasta la mitad de la misma.

([16])*Cf. Bowie* v. *Buscaglia,* 63 D.P.R. 546, 552; *Tugwell* v. *Corte de Distrito,* 64 D.P.R. 220.

tienen postes indicadores señalando en dirección de *ejusdem generis* y refuerzan su aplicación en este caso.

Primero, cojamos (*a*) el lenguaje del inciso 27 y (*b*) la posición de la frase general allí expuesta. Leyendo el inciso 27 para determinar como mejor podamos la intención legislativa, encontramos dificultad en evadir la conclusión de que "aparatos automáticos movidos por gas flúido o electricidad"—que inmediatamente siguen al final de la lista específica de artículos, "abanicos o ventiladores eléctricos y neveras y estufas eléctricas o de gas flúido"—no es otra cosa que una frase para incluir todos los artículos de naturaleza similar no enumerados específicamente (*clean-up phrase*). Los abanicos, neveras y estufas son comodidades domésticas compradas por precios comparativamente bajos; nadie posiblemente los pondría en la misma clase que maquinaria industrial gigantesca y costosa tales como las prensas rotativas y las tremendas turbinas, que constituyen virtualmente plantas por sí mismas. Sencillamente no podemos concebir que una persona corriente—leyendo la referida frase general en su contexto de artículos específicamente enumerados —concluya que ella cubre tanto a una prensa rotativa como a artículos domésticos.([17])

Y si bien no deseamos hacer hincapié en cuestiones de forma, la Legislatura no hizo insinuación o advertencia de que la frase general "aparatos automáticos movidos por gas flúido o electricidad" era una clasificación separada—y amplia en demasía—de la misma sin relación alguna a la lista detallada de artículos que inmediatamente la precedían. Quizás esto se hubiera llevado a cabo haciéndola constar aparte de los otros artículos allí enumerados incluyéndola entre puntos y comas; o mejor aún, poniéndola en su propio in-

---

([17])Un corolario obvio de la regla de *ejusdem generis,* que nace de la teoría de que palabras generales incluyen sólo artículos de la misma clase como aquéllos enumerados específicamente, es que "las palabras generales no incluirán ninguno de los objetos de una clase superior a aquéllos designados por las palabras específicas". .(2 Sutherland, supra, pág. 401.)

ciso separado.([18]) Por el contrario, se insertó al final del inciso 27 y se separó de los artículos específicos sólo por una coma. Esta es la manera casi universal en que palabras generales son puestas en una ley cuando la Legislatura quiere decir que tales palabras participarán del significado limitado de palabras específicas anteriores. Por tanto parece irresistible la conclusión que nuestra Legislatura estaba usando lenguaje de la manera en que la experiencia y la gramática nos han enseñado que ha sido empleado por otros cuerpos legislativos.([19])

Pasemos seguidamente a (c)—el título de la ley. No hay regla que exija que cada inciso de una Ley contributiva deba tener un título adecuado o aun cualquier título. Pero nuestra Legislatura ha elegido ponerle títulos a los incisos de la sección 16. Y "si la ley fuese dudosa, en algún sentido su interpretación quedaría asistida por los términos de su título . . .".([20]) Desde el 1931, cuando se insertó por primera vez la frase general aquí envuelta en el inciso 27 mediante la Ley núm. 83 de 1931, hasta 1942, el título de este inciso leía sustancialmente según constaba en la referida Ley núm. 83 que dice, "abanicos y ventiladores eléctricos, neveras y

---

([18]) Véase el escolio 26.

([19]) Reconocemos que la mayoría de los casos que sostienen la doctrina de *ejusdem generis* han interpretado estatutos en los cuales la frase general ha sido unida a la enumeración precedente por la palabra "otro" o alguna equivalente. (Crawford, *Statutory Construction*, pág. 327, escolio 73). Pero no sabemos de razón alguna—y no hemos encontrado caso alguno que así lo decida— por qué la ausencia de tal palabra copulativa es fatal. Quizás si la lista del inciso 27 hubiera concluído "y *otros* aparatos automáticos movidos por electricidad", hubiera sido tan claro que una rotativa no estaba incluída en ella que el Tesorero no hubiera hecho este esfuerzo tardío para aplicarle el inciso 27 a la misma. Pero la ausencia de "otro" o alguna palabra similar no es decisiva; todos los otros factores aquí indicados son igualmente importantes en la determinación de la intención de la Legislatura.

Añadimos que, al determinar la intención de nuestra Legislatura al aprobar un estatuto específico, son de limitada utilidad los casos de otras jurisdicciones. Al final los factores concluyentes son el lenguaje y el propósito del propio estatuto.

([20]) *South P. R. Sugar Co.* v. *Tesorero de Puerto Rico*, 26 D.P.R. 505, 514; 2 Sutherland, supra, pág. 344.

estufas eléctricas o de gas flúido"—ni una palabra sobre "aparatos automáticos movidos por gas- flúido o electricidad". Todavía hay otra indicación de que las palabras generales eran una frase para incluir todos los artículos de una naturaleza similar, y no se tuvo la intención de que incluyeran plantas enteras de energía o de impresión—valoradas en cientos de miles de dólares—no mencionadas específicamente allí.([21])

De igual manera (d)—la historia legislativa del inciso 27, tanto en cuanto a su cuerpo como en cuanto a su título, no le hace mucho favor al Tesorero. Este inciso empezó a regir como el inciso 41 de la sección 16 en la ley de 1925 (Ley núm. 85, pág. 585). Imponía un arbitrio de 7 por ciento solamente a los abanicos o ventiladores eléctricos; e incluía en su título solamente abanicos y ventiladores eléctricos. Por la Ley núm. 17 de 1927 (Leyes de Puerto Rico, 1927, Segunda Sesión Extraordinaria, pág. 459) el número del inciso se le cambió al número 27 y se impuso contribución tanto a "la introducción" como a la venta o uso. La Ley núm. 83 de 1931, a los fines de este caso, puso el inciso

---

([21])La Legislatura aparentemente reconoció la fuerza del argumento de que la ausencia de referencia alguna a los aparatos automáticos en el título del inciso 27 debilitó considerablemente la teoría de que dicha frase general tenía un significado independiente e ilimitado por sí misma aparte de y más amplio que la lista específica de artículos que la precedía. En 1942—después de surgir la controversia en este caso—la Legislatura, bien independientemente o a sugestión de algún funcionario administrativo, trató de remediar este defecto. La frase "aparatos automáticos movidos por gas flúido o electricidad" fué insertada en el título del inciso 27 (el número de dicho inciso ya había sido cambiado al número 26 por la Ley núm. 158 de 1941 (1) pág. 949) por la Ley núm. 25, Leyes de Puerto Rico, 1942, Tercera Sesión Extraordinaria, pág. 127. Ningún cambio sustancial se hizo en el texto del inciso propiamente dicho—bien en las palabras o en su distribución, con excepción de aumentar el tipo del arbitrio al 15 por ciento. No es necesario que decidamos ahora si tal cambio en el título sólo sería suficiente para ampliar el significado de la frase general hallada en el cuerpo del inciso 27 hasta el extremo de librarla de la regla de *ejusdem generis*. La enmienda del 1942 operó prospectivamente, y no podía afectar responsabilidades contributivas que se alega nacieron desde 1925 a 1941. Para nuestros propósitos, la enmienda fué un esfuerzo indiferente para reforzar una estructura que no existía.

27 sustancialmente en la forma que hoy tiene. El tipo de contribución fué aumentado al 10 por ciento y a los sucesos tributables se les añadió la fabricación. Pero los cambios importantes, a los fines del presente caso, fué que las "neveras y estufas eléctricas o de gas flúido" fueron añadidas a los "abanicos o ventiladores eléctricos", que ya estaban sujetos a contribución; y al final de la misma lista así aumentada, aparecía por primera vez la frase general, "aparatos automáticos movidos por gas flúido o electricidad". El título del inciso 27 se amplió para incluir las neveras y las estufas; pero el título continuó significativamente silencioso —esto continuó, como hemos visto, hasta el 1942—en cuanto a la frase general añadida al inciso por dicha ley.

Por la Ley núm. 108, Leyes de Puerto Rico, 1936 (pág. 567), la Legislatura enmendó el inciso 27 para que proveyera un arbitrio de 10 por ciento sobre todas las partes y accesorios para los artículos aquí enumerados. Además, cambió la posición de la frase general "aparatos automáticos movidos por gas flúido o electricidad".([22]) Esta frase se transfirió de su posición anterior al final de la lista detallada, y se puso en mitad de la lista, que entonces leía: "Sobre todo abanico o ventilador eléctrico, aparatos automáticos movidos por gas flúido o electricidad, neveras y estufas de todas clases, y sobre toda parte o accesorios para los artículos aquí enumerados . . .".

Es difícil determinar el significado, si alguno tiene, de esta curiosa actuación de la Legislatura al trasponer la frase general. De cualquier manera, si bien reconocemos que la frase general casi siempre se encuentra al final de.la lista de artículos específicos—Sutherland, supra, dice a la pág. 395, que las palabras generales "siguen" las palabras específicas —es difícil creer que por este cambio casual y único en el orden de los artículos enumerados en el inciso 27, la Legis-

---

([22])La palabra "flúido" antes de "gas" fué eliminada del texto del inglés, pero permaneció en el español. Esta discrepancia carece de importancia.

latura tuvo la intención de dar el paso radical de revocarse a sí misma completamente en cuanto a todo lo que había ocurrido anteriormente y darle a esa misma frase general —que antes había usado siempre en el sentido limitado de *ejusdem generis*—un significado nuevo, amplio e ilimitado. Este dilema pudo simplemente haber sido producto de un descuido tipográfico en alguna etapa del proceso legislativo. Pero no puede negarse que la Legislatura efectuó el cambio; por tanto, nuestro deber es, si podemos, encontrar algún significado en ello. La más plausible conclusión a que podemos llegar bajo todas las circunstancias es que a lo sumo la Legislatura tuvo en mente que la frase general era la cubierta apropiada para artículos de la misma naturaleza como aquéllos que ahora la preceden en el estatuto—"abanicos eléctricos o ventiladores"; pero que ya no deseaba que cumpliera este propósito—quizás creyéndola inadecuada para ello—en cuanto a neveras y estufas, algunas de las cuales no son movidas por gas flúido o electricidad. Puede o no puede continuar incluyendo artículos de la misma clase como neveras y estufas. Esta cuestión no está ante nos y la dejamos sin resolver. Sólo resolvemos que al intercalarla en mitad de la lista después de abanicos eléctricos o ventiladores por sí solo no le dió con esto un nuevo significado suficientemente amplio para incluir una rotativa.

El cambio en el título efectuado por la Ley núm. 108 sostiene este punto de vista. La Legislatura cuidadosamente insertó "partes y accesorios" en el título. Pero éste, como hemos visto, nunca contuvo una palabra sobre "aparatos automáticos movidos por gas flúido o electricidad" hasta 1942, que fué después de ocurrir el alegado suceso tributable aquí envuelto y después de surgir esta controversia. Y como se notará más adelante, no obstante esta enmienda de 1936, la posición del Tesorero, asumida originalmente en 1931, de que la frase general tenía un significado limitado, tanto en interpretaciones administrativas como en su reglamento for-

mal, permaneció inalterada durante seis años más, en los cuales los contribuyentes continuaron realizando transacciones comerciales descansando en la misma.

En dos palabras la historia legislativa del inciso 27([23]) tiene, una cualidad algo negativa. No le da ningún apoyo específico a la posición del Ilustrado. Pero tampoco proporciona fundamento alguno para concluir que todos los otros factores aquí indicados, que abrumadoramente señalan la aplicación de *ejusdem generis,* han sido vencidos por esta historia legislativa.

Examinaremos finalmente la última de las guías arriba indicadas para determinar si la Legislatura tuvo una clara intención contra la aplicación de *ejusdem generis*—(e), estatutos en *pari materia.* La única ley que hemos encontrado que tiene alguna relación con este problema es otro inciso de la sección 16 de la Ley de Rentas Internas.([24]) Empezó como el inciso 31; por la Ley núm. 17 de 1927 (pág. 459) se convirtió en el inciso 19; y en la Ley núm. 83 de 1931 (pág. 505) se enmendó para proveer un arbitrio al mismo tipo del 10 por ciento "Sobre todo aparato eléctrico o de gas fluído

---

([23])Notamos, con el fin de completar la historia legislativa del inciso 27, que se transformó en el inciso 26 por la Ley núm. 158, Leyes de Puerto Rico, 1941, sin ningún cambio material. (La letra "o" fué insertada entre "ventilador" y "aparatos automáticos" en el texto español; esto no se hizo en la versión inglesa. De cualquier modo, el cambio no tiene significación aquí). Y, como ya hemos visto, la Ley núm. 25 de 1942, Tercera Sesión Extraordinaria, amplió el título de este inciso y aumentó el tipo de contribución allí fijado, sin afectar la presente controversia.

([24])La Ley núm. 77, Leyes de Puerto Rico, 1944, (pág. 167), añadió la sección 16B a la Ley de Rentas Internas, disponiendo que "Estarán exentos del pago de los arbitrios impuestos por esta Ley toda maquinaria, aparato o equipo que sea esencial para el establecimiento y funcionamiento de plantas industriales . . . ". Aun cuando ambas partes la invocan aquí, no está en *pari materia;* fué aprobada por una Legislatura posterior mucho después de ocurrir los sucesos aquí envueltos, y no puede proporcionar una contestación concluyente en cuanto al significado de la legislación anterior que aquí examinamos. A lo sumo, el estatuto de 1944 revela un deseo por parte de la Legislatura para promover la industrialización de Puerto Rico eliminando totalmente todas las cuestiones complicadas aquí envueltas en cuanto a transacciones futuras. Pero las transacciones pasadas tuvieron lugar bajo estatutos anteriores; la ley de 1944 ni le impone contribución ni los exime del pago de la misma.

para iluminación o calefacción, incluyendo aparatos para alumbrado e iluminación interior o exterior de casas, edificios, y vehículos, y partes ·y accesorios para los mismos . . .".(25)

Pero ¿por qué razón insertar tal párrafo en la ley de Rentas Internas mediante la Ley núm. 83 si la misma Ley núm. 83 enmendaba el inciso 27 para que incluyera la frase general "aparatos automáticos movidos por gas flúido o electricidad", la que, según el Tesorero, era tan amplia e ilimitada que los artículos tributados por el inciso 19 ya estaban incluídos dentro de la fraseología general de la enmienda al inciso 27? Obviamente, la Legislatura tuvo la intención de que la frase general del inciso 27 tuviera solamente el significado limitado dictado por *ejusdem generis;* y aparentemente creyendo que los aparatos eléctricos o de gas para el alumbrado o la calefacción no caían dentro del *genus* del inciso 27, según quedó enmendado por la Ley núm. 83, dispuso en un inciso separado de la Ley núm. 83—inciso 19— la tributación para ellos al mismo tipo del 10 por ciento. La Legislatura, en síntesis, encontró necesario proveer en un inciso separado la tributación de artículos—al mismo tipo— que ya estarían cubiertos por el inciso 27 si le diéramos a éste el alcance amplio e ilimitado que alega el Tesorero.(26)

(25)Las Leyes núm. 108 de 1936 y núm. 158 de 1941 enmendaron el inciso 19, pero no en forma relevante en este caso. La última cambió el número del inciso de 19 a 20 y añadió a los artículos sujetos a contribución los aparatos de aire acondicionado. Y por la Ley núm. 25 de 1942 el tipo de contribución en el inciso 20 fué aumentado a 15 por ciento; este mismo tipo nuevo del 15 por ciento fué prescrito también para el inciso 27 (ahora 26) en la Ley núm. 25.

(26)Aun cuando no puede afectar este caso por haber tenido lugar después de nacida la controversia aquí envuelta, notamos que la Legislatura subsiguientemente amplió considerablemente el inciso 19 (ahora 20) al disponer un arbitrio "Sobre todo aparato eléctrico o de gas flúido, *sin importar el uso para el cual se destine.*" (Bastardillas nuestras. Ley núm. 25 de 1942 ((2) pág. 127); Ley núm. 116 de 1943, pág. 335). De ser pertinente a este caso, que no lo es, tal fraseología general en un *inciso separado* disponiendo tal contribución al mismo tipo, haría aún más claro el deber nuestro de rechazar la contención del Tesorero de que las palabras generales del inciso 27 tienen un significado amplio e ilimitado.

Convenir con el Tesorero en este caso nos obligaría por tanto a resolver que un inciso de la Ley de Rentas Internas que se aprobó al mismo tiempo que los "aparatos automáticos movidos por gas flúido y electricidad" aparecieron por primera vez en el inciso 27, era superfluo porque los artículos allí tributados ya habían sido incluídos dentro de la fraseología general—e ilimitada—del inciso 27. Pero debemos leer los incisos conjuntamente y darle a cada uno, de ser posible, algún significado. Por tanto escasamente podemos resolver que un inciso en *pari materia* con el inciso 27 niegue la conclusión de que *ejusdem generis* se aplica aquí y señala en su lugar la clara intención de parte de la Legislatura hacia lo contrario.

Alejándonos de los requisitos de *ejusdem generis* según se aplican al estatuto ante nos, encontramos que tres casos recientes de esta corte, aun cuando no exactamente iguales, prestan apoyo a la conclusión a que hemos llegado. Todos tratan del inciso 8 de la sección 16 de la Ley de Rentas Internas, según fué enmendado por la Ley núm. 108 de 1936, que disponía un arbitrio "Sobre todo vehículo y aparato movido por propia impulsión, tales como automóviles, autovagones, camiones, locomotoras, tractores, autos de arrastre, motocicletas (sea cual fuere el nombre con que se conocieren) incluyendo chassis, motores, cuerpos de autos sin motor, tanques, baterías, lanchas, tengan o no puestos los motores . . . ".

Resolvimos en dichos casos que (1) un remolcador no estaba sujeto a contribución por el inciso 8 porque no cae dentro del alcance de ninguno de los artículos enumerados (*Bull Insular Line* v. *Sancho Bonet, Tesorero*, 53 D.P.R. 865); (2) un aeroplano no estaba sujeto a contribución porque no cae dentro del término general "vehículos" según se emplea en dicho inciso (*Serrallés* v. *Sancho Bonet*, 55 D.P.R. 96); y (3) un yate no estaba sujeto a contribución bajo la

934

calificación de "lanchas" contenida en dicho inciso (*Serrallés* v. *Sancho Bonet, Tesorero*, 57 D.P.R. 779).

En dichos casos se pudo muy bien traer el argumento de que había una frase general en el inciso 8—"vehículo y aparato movido por propia impulsión"—que ponía en juego la regla de *ejusdem generis*, no obstante el hecho de que la frase general precedía más bien que seguía a la enumeración; que esto estaba robustecido por el uso de las palabras "tales como" después de la frase general, indicando que la enumeración era sólo demostrativa y no completa, dando margen a que otros artículos similares cayeran bajo la frase general (*Cf. Tugwell* v. *Corte de Distrito*, 64 D.P.R. 220); y finalmente que un remolcador, un yate y un aeroplano, son todos vehículos movidos por propia impulsión de la misma clase general que aquéllos enumerados expresamente. Pero dicho argumento no prevaleció en dichos casos. Esto es particularmente significativo en el segundo caso, que resolvió que un aeroplano no es un "vehículo movido por propia impulsión" "tales como" automóviles, camiones, locomotoras, o lanchas, a pesar del hecho de que todos ellos, incluyendo los aeroplanos, constituyen facilidades de transportación. Esta corte dijo en dicho caso a la pág. 101: " . . . aunque es verdad que las palabras específicas usadas por el legislador para concretar su pensamiento no preceden si que siguen a las generales,([27]) es cierto que la lectura de la ley produce una impresión tan fuerte en el sentido de estar limitada a los vehículos terrestres, que sólo forzando la imaginación podrían comprenderse en ella los aeroplanos."

Los tres casos citados en efecto resuelven que si la Legislatura elige especificar en una lista los artículos sujetos a

---

([27]) Este lenguaje insinúa que la corte tenía en mente el principio de *ejusdem generis*. Al mismo efecto, el lenguaje de *Bull Insular Line, Inc.* v. *Sancho Bonet, Tesorero*, supra, a la pág. 868: "Con mucha frecuencia sucede que una palabra que tiene un significado muy general es usada en forma especializada, pero el poder legislativo cubrió tan sólo una parte limitada de un posible campo de operaciones."

contribución, manifiesta su propósito de referirse a dichos artículos específicos, y a ningunos otros; en su consecuencia, que artículos disimilares, aunque del mismo carácter general, no caen dentro de aquéllos enumerados expresamente —un remolcador o un yate no está sujeto a contribución como una lancha. Y, lo más importante para nosotros aquí, es que aun la frase general usada en tal estatuto no incluiría artículos no enumerados expresamente en el mismo, a pesar del hecho de que los artículos en cuestión caen dentro de la misma clasificación—un aeroplano no está sujeto a contribución como vehículo de propia impulsión.

Es innecesario ir tan lejos en este caso. Aquí le damos a las palabras generales de nuestra ley un significado amplio; como hemos visto, operan para incluir muchos otros artículos que, aunque no enumerados allí específicamente, son de naturaleza similar a los enumerados. Sólo resolvemos que una rotativa no es la misma clase de artículo que un abanico eléctrico—seguramente, una vez que concluyamos que es de aplicación *ejusdem generis,* no puede haber controversia con dicha conclusión. Resolver que la Legislatura pensó que ellos estaban comprendidos en la misma clase de mercancía sería en verdad "forzar la imaginación". El inciso 27 se dirigió a la imposición de contribuciones sobre comodidades modernas, y no a plantas completas de energía o de prensa. Y encontramos que es mucho más fácil llegar a este resultado que a la conclusión de esta corte de que un aeroplano no estaba incluído dentro de la frase "vehículos y aparatos de propia impulsión" que se encuentra en el inciso 8.

Queda por discutir otro importante factor—las interpretaciones administrativas y los reglamentos relacionados con el inciso 27. Hemos concluído que hay una sólida razón para creer que la Legislatura tuvo en mente incluir dentro de la frase general usada en el inciso 27 sólo los artículos del mismo grupo o clase que aquéllos expresamente enumerados

allí, y no otros artículos de una clase diferente y superior, tales como una rotativa. Sin embargo, reconocemos que el asunto no está libre de dificultad. La cuestión es una razonablemente cerrada, y cuando la frase general se insertó por primera vez en el estatuto por la Ley núm. 83 de 1931, quizá nadie hubiera criticado al entonces Tesorero si hubiera asumido administrativamente o por reglamento la posición de que maquinaria industrial pesada estaba comprendida dentro de la frase general. Por lo menos entonces los contribuyentes hubieran sido advertidos de antemano y el asunto sin duda se hubiera resuelto en las cortes o en la Legislatura en una fecha razonablemente temprana. Por el contrario, los anteriores Tesoreros adoptaron una práctica administrativa al efecto de que tal maquinaria estaba comprendida sólo por el arbitrio general sobre el uso montante al 2 por ciento, provisto en la sección 16 a, y actuaron de conformidad durante muchos años.[28]

Además de la práctica administrativa en casos específicos, encontramos que el Tesorero asumió la misma posición como proposición general. El 24 de julio de 1931, inmediatamente después de entrar en vigor la Ley núm. 83 de 1931 —que insertó en el inciso 27 la frase "aparatos automáticos movidos por gas flúido o electricidad"—el Tesorero promulgó un Reglamento de conformidad con dicha ley. La sección 8 del Reglamento enumera 42 artículos. Ciertamente el Tesorero no tenía noción de que podía incluir en dicho inciso tales artículos como una rotativa; sólo enumeró efectos

---

[28] Para una indicación adicional de la práctica administrativa del Tesorero sobre este punto, véase *Compañía Cervecera de Puerto Rico* v. *Buscaglia*, resuelto en el día de hoy, pág. 964, *infra*. En el presente caso la determinación administrativa por los Tesoreros anteriores estaba a favor del Ilustrado a base de completa exención. Esto era tan claramente erróneo que hemos resuelto que, no obstante esta interpretación, el Ilustrado debe pagar el arbitrio del 2 por ciento por el uso provisto por la sección 16a (I, supra), aun cuando no es responsable de penalidad alguna (IX, infra). Pero una vez resuelto que el Ilustrado no está enteramente exento, tiene derecho a valerse de la posición administrativa del Tesorero al efecto de que debía pagar el 2 por ciento, y no el 10 por ciento, sobre la maquinaria pesada.

típicos de uso doméstico tales como los que hemos ya descrito.

Pero lo más significativo de todo es la sección 9 del Reglamento que dice como sigue:

"Sección 9.—*Definición de Incisos de la Sección 16.*—Para los efectos del cobro y pago de los impuestos se definen los siguientes incisos, y la manera de pagar los impuestos, como sigue:

"

"27. *Abanicos y ventiladores, neveras y estufas eléctricas o de gas flúido.*—Se entenderá por abanicos y ventiladores eléctricos o de gas flúido, neveras y estufas eléctricas o de gas flúido, todos aquellos artículos que con cualquier nombre se introduzcan, vendan o usen como tales.

"Dentro de la clasificación de aparatos automáticos movidos por gas flúido o electricidad a que se hace referencia en la Ley estarán comprendidos todos los aparatos automáticos conocidos como tales y entre ellos las máquinas de lavar, planchar y 'vacuum cleaners'."

Ésta era una interpretación administrativa contemporánea expuesta en un reglamento formal por el funcionario encargado de la ejecución de leyes contributivas, que su oficina tradicionalmente prepara para la aprobación de la Legislatura. Dicho reglamento, hasta donde sabemos, nunca ha sido cambiado. De él resulta diáfanamente claro que el Departamento de Tesorería por muchos años consistentemente asumió la posición de que los "aparatos" comprendidos por el inciso 27 sólo pertenecen a la naturaleza doméstica.

Cuando un estatuto es claro, ningún contribuyente puede refugiarse en la interpretación administrativa o en un reglamento en contrario. Pero la incertidumbre se esconde detrás de muchas palabras y frases, especialmente aquéllas usadas en legislación contributiva complicada. Por tanto la Legislatura ha conferido al Tesorero el deber y el poder de promulgar reglamentos que tienen fuerza de ley. Y está bien establecido que una interpretación y/o reglamento consistentes y contemporáneas sobre una cuestión cerrada, de la

cual dependen durante un número de años todos los interesados, disipa las dudas que de otro modo surgirían en cuanto al significado del estatuto, con el corolario de que tanto el gobierno como el contribuyente están obligados por él (*Pyramid Products, Inc.* v. *Buscaglia, Tesorero,* ante, pág. 828; *Brewster* v. *Gage,* 280 U. S. 327, 336; *White* v. *Winchester Club,* 315 U. S. 32, 41; *Bowie* v. *Buscaglia,* 63 D.P. R. 546, 556, escolio 5; *Meléndez* v. *Registrador,* 63 D.P.R. 1023, 1031; *Liggett & Myers Tobacco Co.* v. *Buscaglia,* 64 D.P.R. 78; 1 Mertens, *Law of Federal Income Taxation,* sección 3.20). La fuerza de esta teoría se aumenta en una situación donde como en este caso la Legislatura reenacta el estatuto sin cambio sustancial alguno después de tener conocimiento de dicha práctica administrativa o reglamento ( *Pyramid Products, Inc.* v. *Buscaglia, Tes.,* supra; *Commissioner of Internal Revenue* v. *Wheeler, et al.*____U. S.____, escolio 10, resuelto el 26 de marzo de 1945).

Ya hemos indicado nuestro punto de vista, como cuestión de interpretación estatutaria, de que la fraseología general del inciso 27 no incluye una rotativa. Pero si aun subsistiera alguna duda en nuestra mente, estaríamos obligados a descartarla en virtud de la práctica administrativa ininterrumpida y el reglamento al mismo efecto durante once años; esto último destruye definitivamente la posición del Tesorero en este caso. Por tanto resolvemos que la maquinaria aquí envuelta no está sujeta a la contribución del 10 por ciento sobre el uso de la misma provista en el inciso 27 de la sección 16, si bien, por razones que se indicarán en IV, *infra,* sí está sujeta a la contribución del 2 por ciento sobre el uso dispuesta por la sección 16 *a.*([29])

---

([29])La corte de distrito incluyó otras máquinas impresoras y linotipias dentro de la misma categoría de la rotativa. Nada ha sido traído a nuestra atención en cuanto al hecho de por qué no deben tratarse de este modo a los fines del presente caso.

# IV

■ En su opinión original y sentencia, la corte de distrito resolvió que la sección 16 *a* de la Ley de Rentas Internas, que proveía una contribución del 2 por ciento sobre el uso, era de aplicación a los artículos traídos a Puerto Rico por el Ilustrado, incluyendo las prensas, linotipias, papel, tinta, plomo, matrices, etc. Dicha sección[30] dice en parte como sigue: "Se impondrá y cobrará, por una sola vez sobre todos los artículos comprendidos en la sección 62 de esta Ley, una contribución de dos (2%) por ciento *ad valorem*... cuando dichos artículos sean fabricados, producidos o introducidos en Puerto Rico para uso o consumo doméstico sin fines comerciales . . . ".[31]

El Ilustrado señala como error esta resolución de la corte de distrito, por el fundamento de que trajo todos los artículos aquí envueltos a Puerto Rico para fines comerciales, vg., para utilizarlos en la publicación, diseminación y venta de sus diarios y revista. Sin embargo, convenir con el Ilustrado nos obligaría a perder de vista el propósito de las secciones 62 y 16 *a*. Después de aprobarse en 1925 la Ley de Rentas Internas, inmediatamente se hizo obvio que la Legislatura había dejado una seria laguna en el estatuto. La sección 16 imponía arbitrios a ciertos tipos sobre la venta o uso en Puerto Rico de varios artículos, todos mayores del 2 por ciento. Para todos los artículos no comprendidos en la sección 16 que eran objeto del comercio, la sección 62 disponía un arbitrio general del 2 por ciento—pero sólo sobre las ventas de los mismos en Puerto Rico. Por tanto se podría

---

(30)Sección 3, Ley núm. 17, Leyes de Puerto Rico, 1927, Segunda Sesión Extraordinaria (pág. 459).

(31)La sección 7 de la Ley de Rentas Internas, Ley núm. 85, Leyes de Puerto Rico, 1925, dice como sigue: "Sección 7.—*Definición de las palabras 'uso' y 'consumo'.*—Las palabras 'uso' y 'consumo' tal como se emplean en esta Ley se interpretarán en su más corriente significación. Cuando un artículo tributable no haya sido adquirido para la venta, se entenderá que ha de ser destinado para ser usado o consumido por el adquirente."

evadir fácilmente el arbitrio del 2 por ciento sobre las ventas provisto por la sección 62, comprando artículos fuera de Puerto Rico para usarse en Puerto Rico. Por la Ley núm. 17 de 1927, la Legislatura eliminó esta laguna en el estatuto, aprobando la sección 16 *a* que disponía un arbitrio general del 2 por ciento sobre el uso para complementar el arbitrio general del 2 por ciento sobre las ventas de la sección 62. Se tuvo en mente que las secciones 62 y 16 *a* proveyeran entre las dos un arbitrio sobre ventas y uso—impuesto sólo una vez al mismo artículo—del 2 por ciento sobre artículos cuya venta o uso en Puerto Rico no estuviera sujeto expresamente a una contribución mayor bajo la sección 16.

Cuando las secciones 16, 62 y 16 *a* son leídas conjuntamente teniendo en mente esta raigambre,([32]) es claro que la frase ''sin fines comerciales'' no tiene el significado limitado que pretende el Ilustrado que le demos. Por tanto no estamos conformes en que la sección 16 *a* fué solamente designada para imponer contribución a los consumidores que compraban artículos fuera de Puerto Rico para sus necesidades personales y uso aquí. La frase ''uso doméstico'' significaba, en este estatuto, uso dentro de Puerto Rico más bien que en un hogar.([33]) Y de igual manera la frase ''sin fines comerciales'' significaba que el artículo no estaba comprendido por esta sección solamente en caso de que siguiera los cauces del negocio; es decir, venta en Puerto Rico. Esto parecería evidente del hecho de que si se trajeran artículos aquí para ''fines comerciales''—entiéndase para revenderlos—el arbitrio del 2 por ciento sobre la·venta provisto en la

---

([32]) El artículo 18 del Código Civil (ed. 1930) dispone que ''Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro.'' Esta es una codificación de la regla de que las leyes en *pari materia* deben leerse conjuntamente para obtener su verdadero significado. *Flores Alvarez & Co.* v. *Gallardo*, 36 D.P.R. 117, 123. Véase III, supra.

([33]) Sería falaz afirmar que la palabra doméstico se refiere siempre al hogar —tomemos la frase, ''corporación doméstica''.

sección 62 sería impuesto sobre la venta. Visualizando esto, la Legislatura tuvo por intención mediante la sección 16 *a* proveer un arbitrio sobre el uso para todos los artículos no tributados por la sección 16 traídos a Puerto Rico y usados o consumidos aquí sin que ocurriera una venta del mismo en esta jurisdicción. Pero nunca tuvo la intención de conceder inmunidad del arbitrio del 2 por ciento sobre el uso prescrito por la sección 16 *a* a aquéllos que importaban artículos para usarse y consumirse en sus negocios que, de haberse comprado en Puerto Rico, hubieran estado sujetos al arbitrio del 2 por ciento sobre las ventas comprendidas en la sección 62. Por lo menos, en ausencia de una específica disposición mandatoria a ese efecto, no podemos resolver que la Legislatura deliberadamente tuvo el propósito mediante la sección 16 *a* de perpetuar uno de los discrímenes contra un comprador en el mercado local a favor de un comprador fuera de Puerto Rico—cada uno comprando para uso en Puerto Rico—discrimen que se reconoce fué uno de los propósitos eliminar al redactarse dicha sección.(34) No podemos resolver que la corte de distrito cometió error al aplicar la sección 16 *a* a los artículos en cuestión.

## V

En reconsideración la corte de distrito modificó en cuanto a un punto, la fase de su sentencia que acabamos de discutir. Resolvió que la tinta y el papel traídos a Puerto Rico por el Ilustrado no eran tributables bajo la sección 16 *a*.

(34)Nada hallamos en *Flores Alvarez & Co.* v. *Gallardo*, 36 D.P.R. 117, que esté en pugna con esta decisión. El caso de *Flores Alvarez* contiene un *dictum* a las págs. 120, 121, de que no todas las ventas están sujetas a la sección 62, sino sólo aquéllas que envuelven el acto de comercio realizado por un comerciante. La cuestión de si las ''ventas'' esporádicas realizadas por el Ilustrado son actos de comercio dentro de dicha regla es examinada en VII, *infra*. Pero aquí está envuelto el uso y no las ventas. Y, según interpretamos el estatuto, el uso se tributa si los artículos son traídos a Puerto Rico, bien para ser consumidos por el comprador o para ser usados en alguna actividad comercial que no sea la reventa. Por tanto el caso de *Flores Alvarez* no tiene nada que ver con el problema específico que ahora consideramos.

La corte inferior concluyó que el inciso 11 de la sección 83 de la Ley de Rentas Internas es aplicable a estos artículos. Dicho inciso dispone la exención sobre ''La venta, uso o consumo de artículos importados o fabricados en el país que se utilicen como envases o en la presentación o preparación de productos destinados para la venta o para la exportación, siempre que los citados artículos pasen con el producto a poder del comprador.''(³⁵)

La teoría de la corte de distrito fué que el papel y la tinta son usados en la preparación y presentación para la venta de los diarios y la revista, y que dicho papel y tinta pasan con la publicación a la posesión de los compradores; por tanto resolvió que el arbitrio del 2 por ciento sobre el uso que de otra manera habría que pagarse bajo la sección 16 a no es aplicable al papel y a la tinta en virtud del inciso 11 de la sección 83.

No podemos convenir con esta conclusión de la corte inferior. En su opinión en reconsideración la corte de distrito, aplicando la doctrina de *ejusdem generis* al inciso 11, reconoció que: ''De la lectura del inciso 11 que estudiamos se colige fácilmente que el término específico, predominante, es el vocablo *envases,* de conocido significado, y las palabras 'presentación' y 'preparación', son las de significado más amplio. Por consiguiente éstas hay que relacionarlas con aquél y entender por ellas que su significado no puede ser otro que el de trasmitir la idea que aquél expresa.'' Bajo dicho razonamiento, sólo tales cosas como etiquetas, papel de envolver, y varios artículos decorativos, además de los envases, estarían por tanto comprendidos en el inciso 11. Pero la corte de distrito no siguió su propio razonamiento. Por el contrario, sólo llegó a esta resolución mediante lo que nos parece ser un *non sequitur,* que el papel y la tinta son usados para preparar las publicaciones aquí envueltas y pasan con ellas al comprador.

---

(³⁵) El inciso 11 fué añadido a la sección 83 por la Ley núm. 83, Leyes de Puerto Rico, 1931 (pág. 505).

Por el propio enfoque del juez de distrito de *ejusdem generis,* creemos que la exención contenida en el inciso 11 para artículos usados en la presentación y preparación de productos se ideó para que comprendiera sólo los productos que necesitaban envases u otros artículos para hacerlos vendibles y que, aun cuando continuaban hasta cierto punto indeterminado a ser identificables separadamente del producto principal que se vendía, eso no obstante acompañaba el producto hasta el comprador. Véase *Puerto Rico Paper Bag Co. v. Sancho, Tes.,* 53 D.P.R. 776.

Es innecesario determinar aquí si el inciso 11 se aplica si el envase u otro artículo similar, como en la venta de leche y bebidas gaseosas, de una u otra manera retorna al vendedor para ser usado de nuevo, después de haber pasado a la posesión o poder([36]) del comprador y el producto principal vendido ha sido sacado o consumido. Pero el hecho de que en otros casos tal problema muy bien puede surgir, robustece el punto de que el inciso 11 contempla una exención para un artículo subsidiario que estimula la venta que por lo menos retiene hasta este punto su propia identidad, más bien que una exención para materia prima como papel y tinta que constituyen la esencia de un periódico y que no retienen identidad propia fuera de la publicación como tal.

"Pasar con" el producto no es lo mismo que convertirse en una parte material del producto terminado. En esta última situación el material va a formar parte más bien que acompañar al producto terminado. Para ir con el producto, el artículo subsidiario debe ser reconocible separadamente y retener hasta cierto punto su propia identidad más bien que fundirse en el artículo principal. Si es que vamos a dar al lenguaje ordinario su significado claro, no podemos decir que el papel y la tinta pasan con el periódico a la posesión del comprador. Por el contrario, los artículos comerciales

---

([36])De la misma manera, la cuestión de si "posesión" o "poder" aquí significan "título", no está envuelta en este caso.

conocidos como papel y tinta desaparecen completamente como tales cuando se usan en la impresión de un periódico. Y si es necesario algo más, hemos visto que una exención de contribuciones debe otorgarse inequívocamente. (Véase I, supra). No podemos resolver que esto sea cierto aquí.

Tampoco podemos seguir a la corte de distrito en su razonamiento de que la intención de la Legislatura para incluir el papel y la tinta aquí envueltos bajo el inciso 11 puede captarse de las disposiciones del inciso 9 de la sección 83 eximiendo a los periódicos de los arbitrios prescritos por la Ley de Rentas Internas. La corte de distrito resolvió en su sentencia original que sólo el producto terminado, y no la materia prima o la maquinaria usada para publicar periódicos, estaba comprendido dentro del inciso 9. Dicha resolución no fué alterada en reconsideración y ya la hemos aprobado. Véase I, supra. Si acaso, el inciso 9 parece por tanto que opera en dirección contraria: el inciso 9, hablando específicamente de publicaciones, establece una exención limitada y rígida; como consecuencia, ningún otro inciso, que no hable directamente de este asunto, puede interpretarse razonablemente como que amplía dicha exención, particularmente si su lenguaje debe ser forzado fuera de su significado ordinario para llegar a ese fin. Convenimos con el Tesorero de que la corte inferior cometió error al resolver que el papel y la tinta usados por el Ilustrado para la impresión de sus periódicos estaban exentos del arbitrio sobre el uso comprendido en la sección 16 a debido al inciso 11 de la sección 83.([37])

---

([37])Nuestra Legislatura no se ha suscrito a la proposición—excepto en un número limitado de casos en que la ley expresamente otorga las exenciones—que ora la materia prima o el producto terminado debieran estar sujetos al pago de arbitrios, pero nunca a ambos. Algunos estados han eximido de sus leyes imponiendo arbitrios los productos usados por el comprador en la producción de otros artículos (Véanse los casos coleccionados en la Anotación, 139 A.L.R. 372). Aquéllos que defienden tales medidas afirman que de otro modo los artículos son pasados dos veces por el exprimidor de la contribución sobre arbitrios, dando con ello indebida importancia a los arbitrios, por las circunstancias de

## VI

 Nuestra resolución al efecto de que una rotativa traída a Puerto Rico y usada aquí era tributable al 2 por ciento bajo la sección 16 *a* en vez del 10 por ciento bajo el inciso 27 de la sección 16 (Véanse III y IV, supra) no resuelve el problema envuelto en la malograda compra por el Ilustrado de otra prensa valorada aproximadamente en $50,000. Aquí el Ilustrado afirma que no se debe ningún arbitrio aun de conformidad con la sección 16 *a* porque nunca usó esta prensa en Puerto Rico.

El director del Ilustrado declaró que ordenó una prensa Hoe con miras a usarla para publicar el "Puerto Rico Ilustrado" al estilo de la revista "Life". Ésta se entregó en enero de 1936. La casa Hoe envió aquí expertos para ayudar al montaje y a su funcionamiento. Pero pronto se descubrió que esta prensa no rendiría la labor para la cual se ordenó. La casa Hoe envió más expertos, quienes hicieron diversos experimentos, incluyendo el uso de diferente plomo y papel, pero infructuosamente. El director del Ilustrado entonces hizo varios viajes a los Estados Unidos visitando otras casas editoras que se confrontaban con problemas similares. ·Como resultado de estas visitas, por ciertas razones técnicas que no vienen al caso enumerar ahora, concluyó que la prensa Hoe no cumplía con las especificaciones de la orden, y que no era apropiada para los fines para los que se ordenó.

El director del Ilustrado también declaró en cuanto al convenio que hubo para la entrega de esta prensa. Declaró

que (1) desalientan las compras *(deflationary)*, (2) casi invariablemente se le cargan al consumidor, (3) el que los paga lo hace debido a la necesidad de los artículos más bien que, como en contribuciones sobre ingresos, por la habilidad para pagar. Pero ésta es una teoría económica, y no de ley. En dicho campo la decisión cae exclusivamente dentro de la incumbencia de la Legislatura. Aquí sólo notamos que los casos tales como los encontrados en 139 A.L.R. no son aplicables; según se desprende de nuestra discusión en las partes IV y V, nuestra Legislatura ha optado en el pasado por no seguir ese curso. (Véase *Monllor & Boscio, Sucrs.* v. *Sancho, Tes.*, supra).

que "de acuerdo con los contratos que hacen las empresas de periódicos y revistas con las firmas que venden las prensas, la máquina nunca pasa a poder([38]) del periódico o revista hasta tanto es aceptada y da un producto satisfactorio al comprador"; que esta prensa Hoe se ordenó "sujeta a la aprobación nuestra, que rindiera el producto que ellos en su contrato decían"; que por no pasar las pruebas "la máquina nunca fué aceptada por nosotros"; que esta prensa nunca produjo una sola copia de "Puerto Rico Ilustrado"; que mientras estuvo aquí nunca se "usó"·excepción hecha de la prueba que se le hizo a ver si se podía aceptar; y que la casa Hoe convino en que se le devolviera, por· lo cual se le envió otra vez a los Estados Unidos.

La corte de distrito dió crédito al anterior testimonio. El Tesorero no ofreció testimonio en contrario. Las conclusiones de hecho de la corte de distrito están ampliamente sostenidas por la prueba, y no estamos por tanto en libertad de rechazarlas.([39]) El Procurador General, sin embargo, pone todos estos hechos a un lado y descansa en la escueta contención legal, para citar de su alegato, de que "El acto de la introducción del artículo tributable es lo que impone la obligación de pagar el tributo. Tampoco existe en la Ley de Rentas Internas disposición aguna que obligue al Tesorero de Puerto Rico a devolver los arbitrios cobrados por la introducción de algún artículo gravado por la referida ley, si dicho artículo es devuelto posteriormente por la persona que lo introduce."

---

([38])De su declaración y de su testimonio adicional, es obvio que para la mente lega del testigo la palabra "poder", según la usó en su declaración aquí, significa "título" más bien que mera posesión.

([39])Arguye el Tesorero que la prueba demuestra una venta incondicional más bien que una entrega a prueba. Pero la única evidencia sobre esta cuestión fué la del Ilustrado que, como hemos visto, era exactamente lo contrario. Y cuando en la repregunta el director del Ilustrado ofreció mostrarle al abogado del Tesorero toda la documentación del caso, éste rechazó su proposición, diciendo que "No es necesario. Yo no trato de desmentir al testigo sino para aclararlo."

El Procurador General levanta una seria cuestión que ha sido debatida en esta jurisdicción pero nunca resuelta concretamente—¿tiene poder la Legislatura de Puerto Rico para imponer arbitrios a la mera introducción de artículos en Puerto Rico? (*Cf. West India Oil Co.* v. *Domenech,* 311 U. S. 20; *Pyramid Products, Inc.* v. *Buscaglia, Tesorero,* supra; *The Hoover & Allison Co.* v. *Evatt,___U. S.___,* resuelto el 9 de abril de 1945). El Procurador General se limita al párrafo citado. No cita estatuto o casos. Pero aun si el Procurador General hubiera argumentado su caso en detalle, es nuestra creencia que el presente caso no requiere que decidamos tan importante cuestión.

Para resolver este caso es suficiente declarar que creemos que la Legislatura nunca tuvo la intención de que la sección 16 *a* se aplicara a las circunstancias aquí presentes. Como hemos visto, las ventas en Puerto Rico fueron tributadas por la sección 62; y la sección 16 *a,* para complementarla, cubría los casos donde la compra tenía lugar fuera de Puerto Rico para usarse aquí. Pero eso tiene que haber querido decir que si el comprador podía probar que el propósito para el cual se trajeron los artículos a la Isla—para usarse en Puerto Rico—se frustraba, no era de aplicación la sección 16 *a.* No estamos considerando en este caso la cuestión de si la Legislatura tiene el poder de imponer arbitrios sobre el mero acto de introducción. Sólo resolvemos que la Legislatura no contempló bajo los términos de la sección 16 *a* ejercitar tal poder; expresamente dispuso un arbitrio sobre los artículos solamente si eran "fabricados, producidos o *introducidos en Puerto Rico para el uso o consumo doméstico".*([40]) (Bastardillas nuestras).

---

([40]) El disponiéndose al final de la sección 16a " . . . pero el pago se efectuará antes de que dichos artículos sean retirados de la fábrica o de la custodia del correo, aduana, expreso o agencia de vapores . . . " no altera este resultado. Esto era meramente un recurso muy útil para el pago adelantado. Si en última instancia se establecía que el arbitrio no se debía, entonces procedía la devolución.

También creemos importante indicar que nuestra decisión en el caso de *West India Oil Co. (P.R.)* v. *Tesorero de Puerto Rico,* 54 D.P.R. 732, que fué

De la conclusión a que hemos llegado en cuanto a la sección 16 a, es obvio que no ocurrió aquí ningún suceso tributable. Dicha prensa nunca se compró por el Ilustrado. Meramente se le entregó a prueba; y nunca se usó aquí.([41]) Resolver que esta transacción era tributable bajo la sección 16 a sería decidir que la Legislatura tuvo la intención de que cada vez que un comerciante local—o un individuo para uso personal—recibía sujeto a prueba una gran cantidad de artículos que no estuvieran de acuerdo con las especificaciones de la orden, trayendo como resultado su rechazo y devolución, el supuesto comprador local estaría obligado a pagar arbitrios sobre los mismos. Y si hubiera una serie de embarques y rechazos bajo una sola orden, se debería pagar el arbitrio en cada ocasión, de conformidad con esta teoría.

Los resultados contributivos contemplados en el párrafo precedente podrían alcanzarse solamente si la Legislatura tratara de disponer que la introducción sin más fuera tributable. Habrá tiempo de sobra para considerar el alegado poder de la Legislatura para aprobar tal estatuto cuando un caso en que esta cuestión esté envuelta llegue ante nos. Aquí sólo nos concierne la sección 16 a, que provee la tributación solamente en caso de introducción más uso; o en otras palabras, éste es un arbitrio sobre el uso en Puerto Rico des-

---

confirmado en 311 U.S. 20, es claramente distinguible. Allí resolvimos que la gasolina vendida para usarse en alta mar por los barcos que salían de Puerto Rico estaba sujeta a contribución como una venta efectuada en Puerto Rico, de acuerdo con la sección 62. La teoría de nuestra opinión en dicho caso fué que no obstante el hecho de que el contrato de venta se hizo en Nueva York, a los fines contributivos la venta se consumó en Puerto Rico mediante la entrega y la aceptación incondicionales aquí. La sección 16a en manera alguna estaba envuelta en dicho caso y no se mencionó en nuestra opinión. Por otro lado, la cuestión ahora ante nos es si el uso contemplado por la sección 16 a como el suceso tributable ha tenido lugar en Puerto Rico bajo las circunstancias concurrentes. Véase *Pyramid Products Inc.* v. *Buscaglia, Tes.,* supra.

([41])En adición al testimonio ya indicado a ese efecto, en la repregunta el director del Ilustrado declaró lo siguiente: ''P.—¿Qué tiempo tuvo Puerto Rico Ilustrado Inc. esa máquina en uso? R.—Yo no aceptaría la palabra 'uso'. Yo diría que estuvo más de un año montándose, probándose, desmontándose y embalándose, pero nunca produjo una revista para vender.''

pués de haberse introducido en la Isla un artículo. Y la palabra uso en este estatuto tiene una raigambre económica: contempla beneficio o satisfacción que proviene cuando el artículo se emplea para los fines con que se introdujo. La palabra uso, en síntesis, significa algo más que probar un artículo, encontrarlo no satisfactorio, y devolverlo—sin ningún uso en el sentido económico—al supuesto vendedor que lo ha enviado no a virtud de una venta incondicional sino a prueba, en el entendido de que no se consideraría consumada la venta hasta que el artículo se probara, se le diera su aprobación y se aceptara.

La sección 62 provee un arbitrio del 2 por ciento sobre las ventas en Puerto Rico. Nadie alega que la prensa Hoe se vendió en Puerto Rico. La sección 16 a, con el fin de evitar se burlara la sección 62, provee un arbitrio de 2 por ciento sobre artículos comprados fuera de Puerto Rico pero usados aquí. Pero toda vez que hemos concluído que el uso contemplado por la Legislatura no ocurrió, la sección 16 a tampoco es de aplicación aquí.

El hecho de que la prensa permaneciera en Puerto Rico por más de un año no afecta el resultado en este caso específico. La prueba no fué contradicha en cuanto a que este tiempo se utilizó en montar la maquinaria, hacer una prueba en su funcionamiento, esperar a los expertos que le harían nuevas pruebas, etc. El Tesorero no probó que el tiempo que el Ilustrado invirtió para determinar si aceptaba o no la prensa era irrazonable bajo las circunstancias concurrentes. Y hubo prueba afirmativa por el Ilustrado de que la prensa nunca se usó de hecho para producir algo. Nadie podría, desde luego, ordenar un traje a Estados Unidos, usarlo por seis meses, devolverlo alegando que no era aceptable y evadir con ello el arbitrio sobre el uso provisto en la sección 16 a. Unos cuantos minutos son suficientes para probarse un traje. Pero pruebas completas de maquinaria ponderosa, enviada por los fabricantes miles de millas dis-

tantes de esta Isla poco industrializada, pueden fácilmente consumir muchos meses, como sucedió aquí. No podemos resolver que transcurrió un período irrazonable en virtud de las condiciones expuestas. Por tanto no hubo uso de esta prensa en la forma contemplada por la sección 16 a, que hace el uso después de la introducción el suceso tributable.

Tampoco vemos la importancia que le da el Tesorero al hecho de que, bajo el arreglo por el cual esta prensa se dovolvió a la casa Hoe, el Ilustrado hizo un pago de $16,000. El costo de embarque en ambas direcciones sobre un artículo de este tamaño es indudablemente alto; los sueldos y gastos en el envío de expertos a la Isla fueron sustanciales; se inmovilizó maquinaria costosa durante más de un año; y la casa Hoe siempre insistió en que en última instancia la prensa sería sustancialmente satisfactoria.

Ninguna de las partes deseaba incurrir en los gastos de un pleito. En un esfuerzo para evitarse el litigio, se llegó al arreglo en cuestión, se devolvió la prensa Hoe, dejando libre un espacio valiosísimo que ocupaba en el departamento de prensa, y el Ilustrado, que había estado bastante tiempo sin una prensa que necesitaba, compró otra diferente. Indudablemente ambas partes salieron perdiendo en la transacción. Probablemente prefirieron esto a la demora y publicidad de un litigio que por lo menos para una de las partes se hubiera llevado a cabo muy lejos de su domicilio. Pero el hacer que la transacción sea tributable nos obligaría a resolver: (1) el Ilustrado compró la prensa; (2) la usó para la publicación de revistas; (3) la revendió a la casa Hoe. Estos hechos sencillamente nunca ocurrieron, y no los vamos a sacar de la nada.

 El Procurador General también trae la teoría de que éste era un contrato de venta que fué rescindido mediante el pago de $16,000 por el Ilustrado al vendedor potencial. Pero aún si éste fuera el correcto nombre legal para la transacción—los documentos que hubieran esclarecido este punto,

aun cuando se le ofrecieron por el director al abogado del Tesorero durante el juicio, nunca se introdujeron en evidencia— no podemos ver de qué manera esto ayuda aquí al caso del Tesorero. No sabemos de disposición alguna de la Ley de Rentas Internas que tribute contratos de ventas hechas en los Estados Unidos para el envío de los artículos a prueba a Puerto Rico que, en vez de consumarse, son rescindidos antes de que el título de los artículos envueltos haya pasado al comprador potencial en Puerto Rico. No hubo entrega y aceptación incondicional, equivalente a la consumación de la venta en este caso, como ocurrió en *West India Oil Co.* v. *Domenech,* supra. A tenor con los términos del contrato de venta aquí envuelto—hallado probado por la corte de distrito por testimonio no controvertido—si la prensa se hubiera entregado, probado, aprobado y el Ilustrado hubiera asumido el título de la misma, el suceso tributable del uso en Puerto Rico hubiera surgido después. Pero toda vez que tal uso como hemos visto, no ocurrió aquí, y toda vez que tampoco ocurrió aquí una venta, no podemos ver qué suceso tributable comprendido en la sección 16 *a*—o en cualquiera otra sección —ocurrió como resultado de la rescisión del contrato de venta original. Nada tiene que ver con este asunto el pago hecho por el Ilustrado para terminar amigablemente la disputa en cuanto a (1) gastos de embarque, (2) gastos de expertos enviados por la casa Hoe y (3) el funcionamiento de la prensa. El decidir lo contrario equivaldría a resolver que uno que contrate en Nueva York la compra de un automóvil y después se arrepienta, si paga la suma de $500 para rescindir el contrato, estaría sujeto al pago de los arbitrios en Puerto Rico aun cuando nunca obtuvo el título o el uso del automóvil.([42])

([42])A la Legislatura se le había llamado la atención hacia este problema. Había dispuesto que aún en el caso de una venta *incondicional,* en la cual ya el título había pasado al comprador, en cuanto a los artículos recibidos en Puerto Rico y devueltos al vendedor dentro de diez días, o recibidos en malas condiciones, el comprador está exento de pagar el arbitrio (Sección 2 de la Ley núm. 77,

La corte de distrito no erró al resolver que no se debía arbitrio alguno en virtud del infructuoso esfuerzo del Ilustrado para comprar una rotativa Hoe.

## VII

Resta por considerar la comparativamente pequeña cantidad de papel, tinta, etc., valorada aproximadamente en $35,000, que el Ilustrado "vendió"—algunas veces, según la prueba, sin recibir paga alguna—a competidores como una cuestión de gentileza. Estas transacciones esporádicas tuvieron lugar durante un período de 17 años, sacándose los efectos de las grandes reservas de emergencia que el Ilustrado siempre tiene a mano para su propio uso. La corte de distrito resolvió que el Ilustrado no estaba en el negocio de venta, y que por tanto estas transacciones no eran tributables bajo la sección 62.([45])

Dicha resolución ordinariamente daría lugar a serias cuestiones. La sección 62 no contiene disposición alguna de que el vendedor deba dedicarse exclusivamente al negocio de venta. En verdad, como la propia corte de distrito indica, el Ilustrado pagó sin protesta arbitrios de ventas sobre sus ventas esporádicas de fotografías tomadas y reveladas en primer lugar para la publicación de sus periódicos. La sección 62 sólo requiere que ocurran "las ventas de cualesquiera artículos objeto de comercio". Además, el dejar de cobrarle el precio de venta al comprador no impide que se le cobre al vendedor el arbitrio: la sección 62 exige que se pague el arbitrio "al final de cada mes [por] la persona que haya

Leyes de Puerto Rico, 1944 (pág. 167), que adiciona la sección 16-C a la Ley de Rentas Internas). *A fortiori*, artículos embarcados a prueba y nunca aceptados por el comprador bajo un contrato de venta expresamente conteniendo tales términos, y nunca usados en Puerto Rico, no son tributables.

([45])La sección 62 fué enmendada por la ley núm. 17, Leyes de Puerto Rico, 1927 (pág. 459), en una forma que no es relevante en este caso. Desde 1927 hasta su derogación por la Ley núm. 29, Leyes de Puerto Rico, 1941 ( (1) pág. 469), permaneció inalterada.

efectuado dichas ventas" "bien de contado o bien a crédito".([44])

Por otro lado, en algunos estados hay estatutos que expresamente eximen ventas casuales y esporádicas por un vendedor que no se dedica al negocio de vender bienes muebles o tangibles (139 A.L.R. 372). Y en el pasado hemos reconocido algunas limitaciones a la sección 62, aunque nunca hemos expuesto en detalle este concepto. En *Flores Alvarez & Co.* v. *Gallardo*, 36 D.P.R. 117, esta corte dijo a la pág. 120: "Sin embargo, no tenemos duda alguna de que la contribución no es aplicable a todas las ventas. La sección 62 dice 'sobre la venta de cualesquiera artículos objeto de comercio' . . . 'el objeto de comercio' hace una segregación suficiente de las ventas. . . . . En Puerto Rico pueden efectuarse innumerables ventas de propiedad personal, sin ser actos de comercio. Prácticamente, todo acto de un comerciante en el curso de su negocio es objeto de comercio."

Sin embargo, no es necesario que hagamos una determinación final en cuanto a la corrección de la resolución del juez de distrito sobre este punto. Se vió obligado a considerarlo porque concluyó que el arbitrio sobre el uso prescrito en la sección 16 a no se aplicaba a la existencia de papel y tinta. Pero hemos resuelto que erró a este respecto. Y una vez que concluimos que el uso de tales materiales pone en juego el arbitrio del 2 por ciento sobre el uso provisto en la sección 16 a, el Ilustrado escasamente puede afirmar que no vendió ni usó en Puerto Rico los artículos en cuestión. Si está invocando una especie de doctrina *de minimus* para estas ventas esporádicas, entonces estos artículos nunca han abandonado la corriente principal de los efectos del Ilustrado sobre los cuales el arbitrio del 2 por ciento sobre el uso provisto en la sección 16 a se aplica en su totalidad. Y en lo que se refiere al no haber cobrado el importe

([44])Los arbitrios provistos en nuestra Ley de Rentas Internas nada tienen que ver con las ganancias, las cuales se tributan mediante una forma diferente de contribución—la contribución sobre ingresos.

de algunas de "las ventas", el Ilustrado puede, si así desea, convertirse en un buen Samaritano—pero su generosidad no puede incluir los arbitrios del Gobierno.

En síntesis no tenemos que decidir en este caso cuál teoría debe prevalecer. Estos artículos fueron traídos a la Isla por el Ilustrado. Posteriormente no desaparecieron en el aire. El Ilustrado o los usó para confeccionar sus periódicos—o los vendió. La sección 7 de la Ley de Rentas Internas impide cualquier artimaña legal por la cual, bajo cualquier teoría ingeniosa de que los artículos no se trajeron ni para la venta ni para el uso, se evita el arbitrio. Dicha sección dispone que "Cuando un artículo tributable no haya sido adquirido para la venta, se entenderá que ha de ser destinado para ser usado o consumido por el adquirente."

Por tanto basta decir que bajo una u otra teoría—pero sólo una vez, ya que tanto la sección 62 como la sección 16 a disponen que los arbitrios allí impuestos deben pagarse sólo una vez—el Gobierno tiene derecho a cobrar el arbitrio del 2 por ciento. Solamente si las secciones 62 y 16 a dispusieran tipos diferentes—que no es el caso—estaríamos llamados a determinar bajo las circunstancias peculiares aquí envueltas si debe aplicarse el arbitrio sobre el uso (sección 16 a) o sobre las ventas (sección 62). Este pleito envuelve dinero, no nombres. Hemos resuelto que el dinero se debe. Huelga cualquier paso adicional. La corte de distrito por tanto erró al ordenar el reembolso del 2 por ciento pagado sobre estos artículos.

## VIII

El Tesorero demandó el pago de los arbitrios en este caso en el año 1942 a tenor con ciertas secciones de la Ley de Rentas Internas ya discutidas en detalle. Pero dichas secciones fueron derogadas por la Ley núm. 29, Leyes de Puerto Rico, 1941, que no contenía una cláusula de reserva en cuanto a los arbitrios debidos de acuerdo con ellas pero pendientes de cobro todavía. Por tanto el Ilustrado

alega que su responsabilidad por los arbitrios y penalidades aquí envueltos, aun asumiendo que existió alguna vez, ha sido eliminada por el estatuto derogatorio. La corte de distrito resolvió lo contrario, descansando en el artículo 386 del Código Político, aprobado en 1902, que dice como sigue:

"La derogación de cualquier estatuto por la Asamblea Legislativa no tendrá el efecto de exonerar o eximir de ninguna pena, embargo, confiscación o responsabilidad en que se hubiere incurrido bajo dicho estatuto, a menos que la ley derogatoria así lo dispusiere expresamente, y se tendrá por vigente dicho estatuto, al objeto de sostener la respectiva acción o proceso para exigir el cumplimiento de dicha pena, embargo, confiscación o responsabilidad."

Según señala 1 Sutherland, supra, a la pág. 522, la derogación de un estatuto destruye su efectividad *in futuro*, y despoja el derecho a proceder bajo la ley, la que, excepto en cuanto a los procedimientos pasados y terminados, es considerada como si nunca hubiera existido.([45]) Pero esta misma sección establece una limitación importante: dicho principio no impera cuando existe una cláusula de reserva en la propia ley o en una *ley general de reserva*. Y "una mayoría de las jurisdicciones de los Estados Unidos han aprobado estatutos generales de reserva con el expreso propósito de obtener la continuación del estatuto derogado en lo que respecta a actividades pasadas y acciones legales pendientes."([46]) Tal cláusula general de reserva evade el áspero e injusto resultado que "es demostrado por la pérdida de derechos resultantes y de acciones pendientes y la inhabilidad de los gobiernos estatal y federal de procesar a un conocido infractor de la ley una vez que el estatuto del que dependan las acciones o la prosecución es derogado. *State ex rel. Osage County Savings and Loan Ass'n v. Worten,* 167 Okla. 187, 29 P. (2d) 1 (1933). Cuando existe una cláusula general de reserva, ésta proporciona el verdadero medio de de-

([45]) Véanse casos citados en el escolio 2, 1 Sutherland, supra, pág. 523.
([46]) 1 Sutherland, supra, pág. 530.

terminar el efecto de la derogación. *Merlo* v. *Johnston City & Big Muddy Coal and Mining Co.,* 258 Ill. 328, 101 N. E. 525 (1913)."[47]

Sutherland concluye (págs. 531–2) que "Cuando un estatuto es derogado, una ley general de reserva opera para salvar cualquier derecho sustantivo de naturaleza privada, responsabilidad, derecho de acción, penalidad, confiscación u ofensa resultante del estatuto derogado." Véanse casos citados en el escolio 4, pág. 532.

Por tanto no podemos convenir con el argumento del Ilustrado de que el artículo 386 del Código Político no tuvo el efecto de continuar su responsabilidad por los arbitrios y penalidades que se alega debía a tenor con las secciones derogadas de la Ley de Rentas Internas. El artículo 386 está redactado en la forma clásica de los estatutos generales de reserva. Es casi una copia exacta del estatuto Federal que fué interpretado en *Hertz* v. *Woodman,* 218 U. S. 205, para salvar la causa de acción por contribuciones y penalidades bajo tales circunstancias. El número de casos estatales— citados en 1 Sutherland, supra—en contra de la contención del Ilustrado es abrumadora. En verdad, ésta es precisamente la clase de casos para cubrir los cuales se redactó el artículo 386.

El hecho de que en otras ocasiones la Legislatura insertara cláusulas de reserva específicas en leyes derogatorias (sección 5, Ley núm. 17, Leyes de Puerto Rico, 1927, Segunda Sesión Extraordinaria; sección 7, Ley núm. 83, Leyes de Puerto Rico, 1931) no tiene el significado que le atribuye el Ilustrado. Aparentemente la Legislatura adoptó esta actitud excediéndose en sus precauciones. Aun en ausencia de tales cláusulas de reserva especiales, la ley de reserva general, comprendida en el artículo 386, se hubiera hecho cargo de la situación. "Evidentemente, la aclaración era una precaución redundante con el fin de evitar que se 'tergiverse la

---

[47] 1 Sutherland, supra, pág. 530–1, escolio 1.

intención legislativa' ''. *Merril* v. *Fahs,* 324 U.S. 308, 312.

Tampoco podemos ver de qué manera el argumento del Ilustrado de que una Legislatura anterior no puede obligar a una Legislatura posterior, tenga relevancia en este caso. Desde luego ésa es una proposición obvia. Pero el punto es que la Legislatura posterior de 1941 no contempló derogar o modificar la ley de 1902. Guardó silencio sobre esa cuestión. Dicho silencio dejó intacta la ley general de reserva de 1902. Por tanto es de aplicación aquí. La corte de distrito no cometió error al resolver que el estatuto derogatorio —Ley núm. 29 de 1941—no relevó al Ilustrado del pago de arbitrios y penalidades debidas bajo las secciones derogadas por la Ley núm. 29.(⁴⁸)

## IX

▆ Las penalidades cuyo pago se exigió al Ilustrado deben ser eliminadas en cuanto a algunos artículos y en cuanto a otros considerablemente reducidas, en vista de que hemos resuelto que algunos de los artículos no eran tributables y de que otros eran tributables al 2 por ciento, en vez de al 10 por ciento. Pero el Ilustrado levanta una cuestión más fundamental—¿podía el Tesorero imponer penalidad alguna bajo las circunstancias de este caso?

El director del Ilustrado declaró que la cuestión de su responsabilidad por los arbitrios había sido levantada por un número de Tesoreros—los señores Gallardo, Domenech y Sancho Bonet—antes de que el actual Tesorero viniera a

---

(⁴⁸)Esta corte resolvió en el caso de *The Texas Co.* v. *Tesorero,* 50 D.P.R. 432, 449, que ''cuando se deroga un estatuto que impone penalidades a los contribuyentes morosos, dichas penalidades dejan de ser imponibles, y el derecho de recobrar penalidades impuestas con anterioridad a la derogación de la ley se pierde, a menos que ese derecho sea expresamente reservado por la ley derogatoria.'' Dicha manifestación de la ley debe ser completada añadiendo la frase ''o por una ley general de reserva''. Y el artículo 386, que no se consideró en el caso de *Texas Co.,* como hemos visto, constituye tal estatuto general de reserva. A este efecto, véanse también *Pueblo* v. *Rodríguez,* 50 D.P.R. 36, 40; *Pueblo* v. *Valentín,* 33 D.P.R. 40.

desempeñar el cargo; que "Cada vez que los inspectores del Departamento de Hacienda iban a nuestras oficinas ellos revisaban nuestros archivos y tomaban las facturas o los 'bill of lading' y nosotros le llenábamos una forma que decía que las facturas tales y tales cubren importaciones hechas por Puerto Rico Ilustrado Inc., para la publicación del periódico y no se ha pagado rentas internas sobre ello por estar exenta por la ley. P.—¿A requerimiento del Tesorero ustedes le argumentaron no venir ustedes obligados al pago y no se insistió por el Tesorero? R.—Sí, señor. P.—¿Hasta que recibieron esta carta de agosto del año 1942? R.—Sí, señor."

El abogado del Ilustrado también declaró que, como resultado de las cuestiones levantadas por los entonces Tesoreros, él discutió el asunto personalmente con los señores Domenech y Sancho Bonet sometiéndoles memoranda en relación con el asunto. El Departamento de Hacienda entonces desistió de su esfuerzo para cobrar los arbitrios.

El Tesorero no impugnó este testimonio en manera alguna. La corte de distrito lo creyó. El Tesorero no lo ataca ante esta corte. Por tanto debemos aceptarlo como cierto. En verdad, la naturaleza de esta gran empresa, su volumen de importaciones, y el estatuto Federal que le proporcionaba a los inspectores de Tesorería la cooperación y facilidades del servicio postal y de aduanas para el cumplimiento de la Ley Insular de Rentas Internas (Título 48, sección 741 a, U.S.C.A.) hubiera hecho dudoso cualquier testimonio, que no se ofreció, al efecto de que las importaciones de estos artículos a Puerto Rico desde 1925 a 1942 habían escapado a la atención del Departamento de Hacienda.

Ya hemos rechazado el argumento de que materiales y máquinas usados para publicar periódicos están enteramente exentos de arbitrios. Pero el Ilustrado ciertamente tenía el derecho de alegar tal contención cuando surgió el asunto por primera vez. Y su prueba no contradicha fué que, no im-

porta cuán informalmente se haya hecho, los Tesoreros siguientes estuvieron de acuerdo con esta contención hasta 1942.

Creemos importante indicar ahora que no hubo reglamento formal eximiendo a los periódicos de arbitrios o aun una firme práctica administrativa a este efecto. De ser cierto esto, concebiblemente el Ilustrado podría reclamar la exención de los arbitrios así como de las penalidades sobre los mismos. Véase la última porción de III, supra.([49]) Pero el Ilustrado no invoca las actuaciones pasadas del Departamento de Hacienda para tratar de evadir el pago de los arbitrios. En este estado del caso, descansa en la norma de conducta solamente en apoyo de su posición de que no pueden cobrarse las penalidades, aun cuando admite su responsabilidad por los arbitrios. Y "no es el propósito de la ley penalizar diferencias sinceras de opinión o errores inocentes incurridos a pesar de haberse tomado el cuidado razonable." *Spies* v. *United States*, 317 U. S. 492, 496.

Hemos examinado recientemente esta cuestión a cabalidad en el caso de *West India Oil Co.* v. *Buscaglia, Tes.*, 61 D.P.R. 782. No vemos por tanto, propósito alguno en re-exponer en detalle los motivos que nos llevaron a resolver allí que la Legislatura no tuvo la intención de que se impusiera la penalidad—que consiste en el pago del 10 por ciento del importe de la contribución más intereses al 1 por ciento mensual—bajo las circunstancias injustas y opresivas de dicho caso. (Véase Anotación, 137 A.L.R. 306).

Los hechos en el caso de la *West India* eran más fuertes que en el presente caso. Allí la responsabilidad por el ar-

---

([49])Decimos que el Ilustrado podría "concebiblemente" hacer esta reclamación porque quizás habría aquí un obstáculo adicional. Aun si se probara una firme práctica administrativa, el Ilustrado hubiera tenido que demostrar además que la ley era dudosa o ambigua; ningún Tesorero puede eliminar una sección clara de una ley mediante la práctica administrativa. Véanse I y III, supra. Pero, como se ha dicho en el cuerpo de la opinión, nunca llegamos a esta cuestión aquí porque el Ilustrado descansa en la actitud del Tesorero solamente para impedir el cobro de penalidades y no de los arbitrios propiamente dichos.

bitrio originalmente era más dudosa que aquí, y las aseveraciones del Tesorero de que no se debían fueron dadas según parece afirmativamente en forma más positiva que en el presente caso. Sin embargo, los factores esenciales, que nos llevaron al resultado a que allí llegamos, concurren en el presente caso. Durante 17 años—el período fué de 15 años en el caso de la *West India*—el Tesorero asumió la posición aquí de que no se debían tales arbitrios (61 D.P.R. a la pág. 791), " . . . y, congruente con esta opinión, durante ese largo lapso jamás se intentó imponer o cobrar tal tributo. Aceptando que ésos son los hechos, ¿cómo vamos a exigir a la demandante que pagase esa contribución bajo protesta para evitar el pago de la penalidad, si el propio Tesorero, encargado de cobrarla, insistía en que la demandante no debía tal impuesto?" Y, como se dice a la pág. 792, cuando el Tesorero resolvió que no se debía el arbitrio, era inútil la oferta de pago; solamente cuando el Tesorero acepta el pago tiene el contribuyente la oportunidad de pagar bajo protesta, que es el único otro método a mano para evadir las penalidades.

Sabemos que éste es un caso que está en la línea. Y limitamos nuestra decisión a los hechos específicos del mismo. Pero tres Tesoreros anteriores, con autoridad para ello, habían en efecto resuelto durante 17 años que no había que pagar las contribuciones en este asunto debatido de buena fe, y que rehusarían cualquier oferta de pago que se hiciese. Como dijimos en relación con otra cuestión, en III, supra, si cualquiera de los Tesoreros anteriores hubiera asumido la posición contraria, "por lo menos entonces los contribuyentes hubieran sido advertidos de antemano y el asunto sin duda se hubiera resuelto en las cortes o en la Legislatura en una fecha razonablemente temprana." Aquí obligamos al contribuyente a pagar después de tantos años todos estos arbitrios a pesar de la mencionada conducta de los Tesoreros anteriores. Pero exigir bajo estas circunstancias que el

contribuyente pague además las penalidades que ascienden aproximadamente al doble de los arbitrios en sí, equivaldría a tergiversar el significado de las disposiciones de la ley en cuanto a las penalidades, tal y como se expone en el caso de la *West India*, y a permitir una práctica injusta del gran gobierno de Puerto Rico frente a sus ciudadanos privados.

Escasamente tenemos que añadir que nuestra resolución en manera alguna se aplica a todos los otros casos que envuelven penalidades por dejarse de pagar los arbitrios. En primer lugar la obligación está en el contribuyente de pagar el arbitrio. No se puede ser negligente en el pago del mismo, y alegar entonces su supuesta buena fe cuando el Tesorero le exigió el pago después de una investigación. Tiene que haber una cuestión sustancial([50]) que envuelva responsabilidades por los arbitrios; y el Tesorero tiene que haberle asegurado al contribuyente durante un largo período de tiempo que no tiene que pagar dichos arbitrios. Sólo entonces es que la conducta del contribuyente puede caracterizarse como un "error inocente incurrido a pesar de haberse tomado el cuidado razonable".

Resta sólo indicar que, una vez que el Ilustrado tuvo conocimiento de que la posición del Departamento de Hacienda había sido cambiada por el nuevo Tesorero en 1942, se le podían imponer penalidades por dejar de pagar de ahí en adelante los arbitrios en cuestión. *West India Oil Co.* v. *Buscaglia, Tes.,* supra, pág. 795. Pero aquí, como hemos visto, el Ilustrado prontamente pagó bajo protesta la cantidad requerídale por el Tesorero en 1942. Por tanto, la corte de distrito actuó correctamente al resolver que no podían imponerse penalidades bajo las circunstancias de este caso.

---

([50]) Si el Tesorero hubiera rechazado la reclamación de exención general, el Ilustrado entonces hubiera podido haber levantado la cuestión aún más sustancial de que la mayor parte de los arbitrios aquí envueltos impuestos sobre cientos de miles de dólares de importaciones era pagadera al 2 por ciento y no al 10 por ciento, como alegaba el Tesorero. En verdad, hemos resuelto aquí que el Ilustrado tenía razón en esta contención, y no meramente que la cuestión levantada por él era sustancial.

■ Creemos conveniente indicar que la corte de distrito no discutió dos cuestiones sobre las que se presentó prueba. Toda vez que los alegatos de ambas partes guardan silencio sobre ellas, tampoco las consideraremos. Éstas son: (1) la alegada práctica de añadir el 20 por ciento al precio de venta según factura antes de calcular el arbitrio; y (2) la disputa en cuanto a si ciertos productos eléctricos fueron comprados por el Ilustrado en el mercado local después de haberse pagado los arbitrios sobre ellos por los importadores, o si el Ilustrado había comprado dichos artículos en Nueva York y tenía que pagar los arbitrios sobre ellos cuando se los entregaron aquí.

También el Tesorero señala como error la alegada decisión de la corte de distrito de que "ninguno de los artículos introducidos por la demandante constan mencionados en los diversos apartados de la sección 16 de la Ley de Rentas Internas de Puerto Rico, ni en ninguna de las otras diferentes secciones de la referida ley." Es cierto que en los comienzos de su opinión la corte de distrito hace una manifestación más o menos general a ese efecto. Pero los únicos artículos discutidos expresamente en la opinión de la corte de distrito son aquellos que hemos examinado aquí. Y nada hay en detalle en la sentencia sobre este punto, aunque la corte inferior quizá pasó sobre ello por implicación al resolver que solamente las secciones 16 *a* y 62 son aplicables generalmente aquí.

El Ilustrado no discute la cuestión en su alegato. El Procurador General se limita a afirmar que, con el fin de demostrar que los diferentes incisos de la sección 16 se aplican al caso, "nos basta con hacer referencia a la transcripción de evidencia, páginas 121 a 155 . . . ". La evidencia a que se refiere es un *Exhibit* de 23 páginas del demandante (que finaliza a la pág. 135 y no a la 155) enumerando un sinnúmero de artículos, la mayoría de los mismos descritos en

tan breve forma que no brinda indicio alguno en cuanto a su identidad. Aunque las partes no nos den información sobre la cuestión, aparentemente la gran mayoría de los artículos ya están comprendidos por nuestras resoluciones específicas en este caso. Pero aun si supiéramos lo que realmente son estos cientos de artículos, podríamos determinar si los varios tipos más altos de arbitrios dispuestos en los diferentes incisos de la sección 16 se aplican a ellos—en vez del arbitrio general del 2 por ciento de las secciones 16 a y 62— sólo tratando de clasificar cada artículo bajo un inciso específico tal como leía en el año en que el artículo se introdujo en la Isla. Ésta es una tarea que preferimos no emprender sin la ayuda de los abogados, especialmente toda vez que la corte de distrito no pasó en su sentencia expresamente sobre este punto partida por partida. Si las partes siguen en desacuerdo sobre este problema, pueden presentar la cuestión en detalle a la corte de distrito una vez que devolvamos el caso.

## XI

Finalmente llegamos al problema de redactar nuestra sentencia. La corte de distrito no dictó sentencia para el reembolso de una cantidad específica de dinero. Por el contrario, ordenó al Tesorero a calcular y devolver los arbitrios cobrados aquí de conformidad con (a) inciso 27 de la sección 16; (b) sección 62 en cuanto a la transferencia por el Ilustrado a competidores de artículos usados en la publicación de sus periódicos; (c) secciones 16 a y 62 en cuanto al papel y tinta; y (d) todas las penalidades. La sentencia de la corte de distrito también denegó en términos generales la súplica del Ilustrado para que se le devolviera el 2 por ciento de arbitrios pagados sobre otros artículos de conformidad con las secciones 16 a y 62.

Por las razones aquí expuestas, (a) y (d) serán confirmadas, con la aclaración que quizá sea innecesaria, de que debe pagarse sobre todos los artículos comprendidos en (a)

un arbitrio del 2 por ciento de conformidad con la sección 16 *a*. Pero (*b*) y (*c*) serán revocadas. En su lugar, se dispondrá, en cuanto a (*b*), que el Ilustrado debe pagar un arbitrio de 2 por ciento sobre todos los artículos traspasados a otras entidades para el uso en la publicación de periódicos; y en cuanto a (*c*), que debe pagar un arbitrio del 2 por ciento sobre el uso de papel y tinta a tenor con la sección 16 *a*. Una nueva disposición, aparentemente omitida por inadvertencia, será añadida en cuanto a que deben devolverse todos los arbitrios pagados en relación con la prensa Hoe.

*Así modificada la sentencia será confirmada, y el caso devuelto para los cálculos necesarios, y para ulteriores procedimientos no inconsistentes con esta opinión.*